In re **AMES DEPARTMENT STORES, INC.**, Eastern Retailers Service Corporation, et al., Debtors.

**Bankruptcy Nos. 90B–11233 (HCB) through 90B–11285 (HCB).**

United States Bankruptcy Court, S.D. New York.

May 15, 1990.

Skadden, Arps, Slate, Meagher & Flom by Michael Cook, Alesia Ranney–Martinelli, Luc A. Despins, New York City, for debtors.

Shearman & Sterling by Ronald Dekoven, Jonathan L. Greenblatt, New York City, for Citibank, N.A. and Banks.

Dewey, Ballantine, Bushby, Palmer & Wood by Stuart Hirschfield, Jeffrey Fried-

man, Lori Lapin Jones, New York City, for Official Creditors Committee.

Zalkin Rodin & Goodman by Richard Toder, New York City, for Chemical Bank.

Weil Gotshal & Manges by Martin Bienenstock, New York City, for Bondholders Committee.

Hodgson, Russ, Andrews, Woods & Goodyear by Garry M. Graber, Buffalo, N.Y., for Olin Corp.

## DECISION

HOWARD C. BUSCHMAN, III,
Bankruptcy Judge.

The instant motion by the debtors Ames Department Stores, Inc. ("Ames"), Eastern Retailers et al. and their fifty-one affiliated debtors (collectively "Debtors") for an order approving a $250 million post-petition financing agreement brings to the fore an examination of the considerations and circumstances under which such approval may be granted pursuant to 11 U.S.C. § 364(c) of the Bankruptcy Code, 11 U.S.C. § 101 et seq. (1986) (the "Code").

### I

The Debtors are affiliated companies that own and operate nearly 700 department stores located in the Eastern and Middle Western United States and employing some 55,000 employees. They filed their petitions for reorganization under Chapter 11 of the Code on April 25, 1990.

In the three to four weeks prior to the filing of their petitions, the Debtors had discussions with and sought agreements for post-petition financing from four leading lending institutions. Tr. p. 45.[1] Two of these institutions could not, in Ames' judgment, meet the Debtors' timetables for providing funds. Id. The Debtors entered into negotiations with Citibank N.A. and Chemical Bank. Ultimately, after numerous meetings and telephone conversations, Tr. pp. 102–3, the Citibank group offered $40 million of new financing on a secured and super-priority basis; that is, repayment

of the loan would be secured by all of the assets of all of the debtors junior only to prior security interests and the obligation to repay be accorded a super-priority superior to all administrative expenses incurred and allowed in these cases. The financing would be subject to Ames not having cash losses exceeding $50 million. Tr. pp. 106–7. Further, interest would be paid on Citibank group's pre-petition loan of roughly $460 million and payment of that loan would be cross-collateralized and thus secured by the Debtors' post-petition assets except inventory. Tr. p. 105, Ex. 1. In addition, the Citibank group sought to recycle and elevate the pre-petition debt by providing for its payment from Ames' business and re-loaned through a revolving credit facility as "new" money subject to a determination of their secured status. Tr. p. 106, Ex. 1.

Chemical offered to provide $250 million in financing on an unsecured but super-priority basis. Further negotiations led to a definitive agreement accepted by the Debtors. The salient features of the financing agreement with Chemical are that Chemical and participating lenders would extend, on a super-priority basis, up to $250 million of cash and letter of credit financing until confirmation of a plan of reorganization or April 30, 1991, whichever is earlier. The amount of the loan within the $250 million cap is limited by a borrowing base equal to 30% of the book value of the Debtors' inventory substantially similar in saleability and mix to that of recent operations. Agreement pp. 4, 5, 13. The Debtors would be jointly and generally liable for the full amount. Among the terms of default is the conversion of these cases to Chapter 7, id. p. 41. Financial information is to be supplied to Chemical on a quarterly basis. The Debtors and Chemical are to negotiate, within the next 60 days, the question of whether the borrowing base can be increased to 40% of the retail value of inventory or 50% of the book value of inventory. Id. pp. 4, 5, 27–28; Tr. 108. The Debtors currently value their inventory at $1 billion

---

1. References to "Tr." are to the transcript of the interim hearing held on May 1, 1990. References to "R." are to the transcript of the final hearing held on May 15, 1990. References to "Ex." are to the exhibits at both hearings.

to $1.1 billion—on a cost basis. Tr. p. 113; R. p. 62. Under the current 30% formula, it may be able to draw upon the entire commitment of $250 million. Tr. p. 113; R. p. 62.

By order to show cause dated April 27, 1990 and entered pursuant to Rule 4001(c) of the Bankruptcy Rules, this Court scheduled interim and final hearings with respect to the Debtors' motion for emergency relief and final approval of their agreement with Chemical. At the interim hearing, held on May 1, 1990, the Debtors sought $52 million of emergency financing. The Court, after several hours of testimony, authorized $25 million as the amount "necessary to avoid immediate and irreparable harm to the estate." Rule 4001(c)(2).[2] It was held that the standard was met with respect only to those amounts that were not for the purchase of inventory for some 74 stores that the Debtors had previously announced they would close, although the new Chief Executive Officer testified that he would revisit that issue, and not for those amounts covering one-half of certain unidentified miscellaneous expenses or for continued construction of a new distribution center. To enable the Debtors to further identify miscellaneous expenses and to firm up their position regarding the 74 stores, a second interim hearing was scheduled for May 8, 1990. The Debtors, however, determined not to seek further emergency relief pending the final hearing.

The Debtors' need for financing is not disputed at the final hearing. During the month prior to filing their bankruptcy petitions, the Debtors lost trade credit that enabled the purchase of inventory for the stores. Since filing the petitions, they have enjoyed virtually no trade credit, a letter of credit bank has started to find discrepancies in documentation, and the Debtors have received few goods. R. pp. 31, 78. Sales that aggregated $4.8 billion for the fiscal year ending January 1990 have fallen off by over 30% for the four week period ending May 12, 1990. R. pp. 54–55, 60. Available cash now exceeds $120 million principally because the Debtors continue to sell inventory without replacement. R. pp. 75, 78.

Management forecasts that $150 million of the Chemical financing will be required. They seek authorization for $250 million of credit on the basis of their judgment that the additional availability will encourage suppliers gradually to extend credit. R. p. 59. Their cash projections assume, *inter alia*, ability to attract 15 day trade credit for the next few months and 30 day trade credit thereafter. Ex. 4, p. 4. Trade credit is crucial. Because the Debtors logistically are unable to do business on a C.O.D. basis or provide letter of credit for domestic suppliers, R. p. 73 the Creditors' Committee is not at all certain that trade credit will be forthcoming and suggest that inventory liens be offered to post-petition suppliers. R. pp. 21–22. To this the Debtors respond that they have discussions with some suppliers who have indicated that the current uncertainty lies in the need for approval of the Chemical financing. The Creditors' Committee does not oppose approval of the financing agreement with Chemical in its final form.

## II

It is given that most successful reorganizations require the debtor-in-possession to obtain new financing simultaneously with or soon after the commencement of the Chapter 11 case. Section 364 establishes a

**2.** Rule 4001(c)(2) provides: "The Court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the Court may conduct a hearing before such 15 day period expires, but the Court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."

At the interim hearing, Court held that the immediate and irreparable harm standard of Rule 4001(c)(2), insofar as applied to a business that hopes to reorganize as a going concern, is satisfied by the threatened loss of the business. *Cf. Semmes Motors, Inc. v. Ford Motor Corp.,* 429 F.2d 1197, 1205 (2d Cir.1970) (threatened loss of a business satisfied irreparable injury standard of Rule 65 F.R.C.P. even though its value might be compensable in money damages).

series of possible post-petition transactions in which a debtor might obtain credit:

(i) unsecured credit with an administrative expense status, § 364(a) and (b);

(ii) unsecured credit with a priority over all administrative expenses (*i.e.* a super-priority), § 364(c)(1);

(iii) credit, or other indebtedness, secured by a lien on unencumbered property or with a junior lien on encumbered property, § 364(c)(2) and (c)(3); and

(iv) credit, or other indebtedness, secured by a senior or equal lien on property of the estate that is already subject to a lien, if adequate protection is furnished to the holder of the lien, § 364(d).[3]

For all of these different transactions, except the obtaining of unsecured credit in the ordinary course of business under section 364(a), court authorization after notice and an opportunity for a hearing is required.

In determining whether to approve such a transaction, the Court acts in its informed discretion. Section 364(c) and (d) both state that the court *"may* authorize...." (emphasis added). A court, however, may not approve any credit transaction under subsection (c) unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b). 11 U.S.C. § 364(c); *see In re Antico Mfg. Co.*, 31 B.R. 103, 105, 10 Bankr.Ct.Dec. 1085 (Bankr.E.D.N.Y.1983).

*Cf. Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088, Bankr.L.Rep. (CCH) ¶ 71,146 (4th Cir.1986) (while the trustee must make an effort to find alternative credit sources before section 364(d) becomes available, section 364 imposes no duty upon the trustee to seek credit from every possible lender). Similarly, obtaining credit under section 364(d) may not be authorized if it appears that credit can be obtained under the other subsections of 364.

Once unavailability of less intrusive credit has been shown and adequate protection found if required, the bankruptcy courts, in applying discretion under section 364(b), (c), and (d) have recognized that their discretion is not unbridled. Acknowledging that Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits. *In re Tenny Village Co.*, 104 B.R. 562, 567–70 (Bankr.D.N.H.1989); *In re St. Mary Hospital*, 86 B.R. 393, 551, 17 Bankr.Ct.Dec. 685 (Bankr.E.D.Pa.1988); *In*

**3.** Section 364 provides in pertinent part:

(a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1304, 1203, or 1204 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364.

*re Crouse Group, Inc.,* 71 B.R. 544, 550–51, 15 Bankr.Ct.Dec. 939 (Bankr.E.D.Pa. 1987). They recognize that debtors-in-possession generally enjoy little negotiating power with a proposed lender, particularly where the lender has a pre-petition lien on cash collateral. At the same time, however, they permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties. *In re Federated Department Stores, Inc.,* Camp. 555 (WESTLAW, FBKR–FDS database), 1990 Bankr.LEXIS 472 (Bankr. S.D.Ohio 1990); *In re Simasko Production Co.,* 47 B.R. 444, 449, 12 Bankr.Ct.Dec. 1107 (Bankr.D.Colo.1985).

From these two notions, it might appear that the cases are conflicted. The differences are, however, largely semantic. In *Tenny Village,* the debtor sought post-petition financing under section 364(d) to be supplied by its principal pre-petition secured lender. After finding that certain pre-existing liens were not adequately protected under section 364(d) and that financing could therefore not be approved, the court added that the arrangement also violated the debtor's fiduciary duties to the estate and its creditors in that the "Financing Arrangement would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt." 104 B.R. at 568. The bank was to effectively operate the debtor's business; its pre-petition liens would be immunized from attack by not only the debtor but by a creditors' committee even prior to the appointment of counsel; preference, fraudulent conveyance, lender liability and subordination claims of the estate would be waived; debtor's counsel would not be entitled to payment for any work in a dispute with the bank. Thus, the arrangement would skew

the conduct of the bankruptcy case, destroy the adversary process that contemplates representation by counsel and deprive the estate of possible rights and powers before the creditors' committee counsel would have a reasonable time to examine whether the estate had viable claims.

No court of which we are aware has approved financing arrangements with such features. Indeed, it has been the uniform practice in this Court, particularly since the decisions in *General Electric Credit Corp. v. Peltz (In re Flagstaff Food Service Corp.),* 762 F.2d 10, 13 Bankr.Ct. Dec. 745, Bankr.L.Rep. (CCH) ¶ 70,541 (2d Cir.1985), and *General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Food Service Corp.),* 739 F.2d 73, 12 Bankr.Ct.Dec. 222, Bankr.L.Rep. (CCH) ¶ 69,938 (2d Cir.1984), to insist on a carve out from a super-priority status and post-petition lien in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system. Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced. It is similarly the practice of this Court not to approve financing arrangements containing clauses triggering default on the appointment of a trustee or examiner under section 1104. Such entrenchment of management may not be in the best interests of the estate and only precludes parties-in-interest from seeking to redress fraud or gross mismanagement through such an appointment. Nor are clauses requiring debtor retention of exclusivity approved. Clauses providing for absolute control over fees and entrenchment of management clauses skew the carefully designed balance of debtor and creditor protections that Congress drew in crafting Chapter 11.[4]

---

**4.** There are few reported decisions under § 364. The need for cash is usually immediate. If the court is inclined to grant an application for authority to obtain credit, the time necessary to write an opinion could effectively doom any chance of reorganization. Each judge in the Manhattan branch of this court is presented with at least two such applications each month.

Such applications are regularly granted by bankruptcy courts, *see generally* R. Rosenberg, M. Lurey, M. Flics, L. King, *Collier Lending Institutions and the Bankruptcy Code* ¶ 4.04[3] (1989), provided the standards articulated in the text are not infringed. The standards noted above are usually orally articulated. Debtors' and lenders' counsel are usually aware of these

Moreover, a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate. *Crouse* was such a case. There the debtor, a contractor, sought section 364(c) financing to meet job costs connected with certain construction projects. The proposed lender had bonded pre-petition the debtor's performance for those projects. 71 B.R. at 547. At an interim hearing, the court approved emergency financing to fund pay roll for one week. In exchange for the loan, the lender received a "first position security interest" in the accounts receivable on the bonded projects. The debtor sought to extend the loan. The lender agreed because it needed more time to find a replacement contractor. The court refused to approve the arrangement. It found that, rather than benefit the estate by preserving its assets, the proposed agreement merely allotted more time for the lender to locate a replacement for the debtor while giving the lender priority status among creditors. 71 B.R. at 551. Thus, the terms were not "fair, reasonable, and adequate under the circumstances." *Id.*

Similarly, in *St. Mary,* the debtor sought approval pursuant to section 364(c) of a financing arrangement between a debtor hospital and its parent giving the parent a super-priority on all unencumbered assets of the debtor in return for providing operating funds. Looking at the relationship between the parties and the results of the transaction as a whole, Judge David Scholl found that, because the parent completely dominated the debtor and was responsible for manufacturing the crisis requiring the loan by failing to inform community or governmental entities which might have assisted the debtor, the financing agreement was not fair and reasonable. 86 B.R. at 401. The court found that since the parent was not an outside lender but a "puppeteer of a marionette-debtor" who had tailored the debtor's emergency itself for its own economic benefit, the parent should not be allowed to shift the risk of negative economic consequences to other parties. *Id.*

Cross-collateralization clauses may raise these concerns. Thus, they cannot be approved *ex parte. Otte v. Manufacturers Hanover Commercial Corp. (In re Texlon),* 596 F.2d 1092, 5 Bankr.Ct.Dec. 109, Bankr.L.Rep. (CCH) ¶ 67,109 (2d Cir.1979). Because cross-collateralization of a pre-petition loan with post-petition assets may elevate an unsecured or undersecured loan to fully secured status ahead of other similar claims, creditors are entitled to be heard on whether the potential benefits of the arrangement in preserving a business outweigh the prejudice to them. 596 F.2d at 1098–99. "The debtor in possession is hardly neutral. Its interest is in its own survival, even at the expense of equal treatment of creditors, and close relations with a lending institution tend to prevent the exploration of other available courses in which a more objective receiver or trustee would engage." *Id.* at 1098. Some courts assert that forward cross-collateralization may never be approved. *In re Monach Circuit Indus., Inc.,* 41 B.R. 859, 862, Bankr.L.Rep. (CCH) ¶ 70,025 (Bankr.E.D. Pa.1984); *see also* Tabb, *A Critical Reappraisal of Cross–Collateralization in Bankruptcy,* 60 S.Cal.L.Rev. 169, 175 (1986). Other courts, correctly, examine all the facts and circumstances to determine if the estate is being benefitted rather than principally the pre-petition creditor. *See, e.g., Burchinal v. Central Washington Bank (In re Adams Apple, Inc.),* 829 F.2d 1484, 1490, Bankr.L.Rep. (CCH) ¶ 71,995 (9th Cir.1987); *In re Roblin Indus., Inc.,* 52 B.R. 241, 244–45 (Bankr.W.D.N.Y.1985); *In re Vanguard Diversified, Inc.,* 31 B.R. 364, 366 (Bankr.E.D.N.Y.1983) (articulating a four-part test for cross-collateralization).

Conversely, in *Simasko Production Co.,* the court, where none of these factors were found, held that a debtor-in-possession's business judgment in seeking approval to enter into a super-priority loan secured by a senior lien in order to drill up to seven oil wells would not be disturbed on the basis of differing testimony regarding the prov-

standards and generally tailor their agreements to comply.

idence of its decision. 47 B.R. at 448–49. The court, in *Federated Department Stores,* in authorizing a debtor-in-possession to enter into a credit agreement that, as it appears from the opinion, similarly did not skew the Chapter 11 case and was not principally for the benefit of a pre-petition creditor to the detriment of other parties in interest, found that the agreement was in the best interest of the estate and within the reasonable judgment of the debtor.

These cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.

### III

### A.

Applying the standards of section 364(c) to the facts in this case, it is clear that the Debtors have met their burden of showing the unavailability of alternative unsecured financing. The cases clearly establish that although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b). *Bray v. Shenandoah Federal Savings and Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088, Bankr.L.Rep. (CCH) ¶ 71,146 (4th Cir. 1986); *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr.N.D.Ga.1988); *In re Reading Tube Indus.,* 72 B.R. 329, 332, 15 Bankr.Ct. Dec. 927, Bankr.L.Rep. (CCH) ¶ 71,770 (Bankr.E.D.Pa.1987); *In re Crouse,* 71 B.R. 544, 550, 15 Bankr.Ct.Dec. 939 (Bankr. E.D.Pa.1987). Here, the Debtors have approached four lending institutions with the capability of loaning the large sums necessary to maintain the Debtors' operations. Two of the lenders could not meet the Debtors' time demands and thereby enable the Debtors to order goods for the back to school season. The Debtors then initiated discussions with Citibank and Chemical and accepted Chemical's less onerous offer and

rejected the offer by Citibank, the previous lender. The existence of additional lending institutions with the ability to loan $250 million to financially troubled companies is doubtful. Given that a quick cash infusion is necessary to preserve the Debtors' vulnerable seasonal enterprise and that the Debtors contacted four lenders with the ability to loan such large sums, including its former lenders, *see Crouse,* 71 B.R. at 546–47, 550, this Court is satisfied that the Debtors have demonstrated the unavailability of unsecured financing.

### B.

As originally structured, the proposed agreement with Chemical gave rise to concerns for whether the Chapter 11 process was being leveraged. It provided for default on the appointment of a trustee or examiner with enlarged powers under section 1104 of the Code. It contained no carve out for professional fees from the super-priority to be awarded to Chemical. It provided for default if the Court were to grant relief from the automatic stay at the request of any creditor owed in excess of $20 million.

These are the types of clauses that cause concern. They effectively preclude or limit the ability of parties in interest to seek appointment, pursuant to section 1104(a)(1) or (b) of a trustee or examiner with enlarged powers for fraud, dishonesty or incompetence of management or for mismanagement or irregularities in the management of a debtor's affairs. A failure to provide a reasonable sum for professionals has, in other cases before this Court, left estates, creditors' committees and trustees without the assistance of counsel and the Court without the adversary system contemplated by Congress in 1978 when it, in enacting the Bankruptcy Code, recast the role of bankruptcy judges principally to one of resolving disputes. A provision providing for default or relief from the automatic stay, unless it is limited to the Debtor's principal asset, overreaches and can only be designed to skew the Court's disinterested decision of a motion for such relief with the knowledge that to grant the relief may

affect hundreds of other creditors and thousands of employees.

At the final hearing, these clauses were modified. The order proposed excludes the appointment of a trustee or examiner with enlarged duties on grounds relating to fraud, dishonesty, incompetence, mismanagement and irregularities of current management. A reasonable carve out of $5,000,000 for fees of professionals is provided. Agreement has been reached with the Citibank group, the one group of creditors affected by the $20 million relief clause, that the clause is not affective as to them. The concerns noted above have thus been addressed. The financing agreement also provides for default if these cases are converted to Chapter 7. That clause does not raise the same concerns. On conversion, the reorganization will have ended and all the creditors will be left with the proceeds of liquidation.

### C.

The Creditors' Committee's desire that the Debtors structure differently their appeal to suppliers for a restoration of trade credit, unlike the concerns noted above, falls within the Debtors' business judgment. The Code contemplates that they, unless the Court appoints a trustee pursuant to section 1104 or limits their operation of the business pursuant to section 1108, make the basic decisions governing the use of financing proceeds in the ordinary course of the business. *In re Garland Corp.*, 6 B.R. 456, 460 (BAP 1st Cir.1980). If and when the Committee or any party-in-interest has grounds for relief under those sections, they should make the appropriate motion. As noted above, the Committee today does not oppose the instant motion.

For the foregoing reasons, the motion is to be approved. An order is being entered concurrently with this decision.