**In the Matter of CUISINARTS, INC., Debtor.**

**Bankruptcy No. 2–89–00997.**

United States Bankruptcy Court, D. Connecticut.

June 19, 1990.

Evan D. Flaschen, and Lorraine M. Weil, Hebb & Gitlin, P.C., Hartford, Conn., for First Nat. Bank of Boston, applicant.

Eric J. Small, and Honor S. Heath, Office of U.S. Trustee, New Haven, Conn.

Mark I. Fishman, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., Chapter 11 Trustee.

Martin W. Hoffman, Hartford, Conn., for Unsecured Creditors' Committee.

AMENDED [1] RULING ON APPLICATION OF THE FIRST NATIONAL BANK OF BOSTON FOR REIMBURSEMENT OF COSTS AND EXPENSES PURSUANT TO BANKRUPTCY CODE §§ 506(b) AND/OR 503(b)

ROBERT L. KRECHEVSKY, Chief Judge.

## I.

### ISSUE

In this chapter 11 case, the estate trustee entered into a contract dated November 10, 1989, approximately three months after the filing of the bankruptcy petition, to sell the debtor's entire business. On December 15, 1989, the court, after notice and hearing, approved the contract, and the trustee consummated the sale on December 27, 1989. This ruling deals with a creditor's right to be reimbursed $1,033,446.91 representing monies it paid to two law firms and an investment banker it retained to protect the creditor's interest during and prior to this period. The creditor bases its right to recover such expenses on the provisions of Bankruptcy Code §§ 506(b) [2] and 503(b)(3)

---

1. This ruling has been amended following the granting of the motion of the unsecured creditors' committee for additional finding of facts and amendment of judgment.

2. *§ 506. Determination of secured status.*
 (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
 (b) To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.
11 U.S.C. § 506(a) & (b) (1988).

and (4).[3]

## II.

## BACKGROUND

In the spring of 1989, Cuisinarts, Inc. (the Debtor), the manufacturer of a well-known food processor, was in serious financial difficulty. It owed creditors approximately $43,000,000.00, $20,000,000.00 of which was due The First National Bank of Boston (the Bank), the holder of a senior security interest in all of the Debtor's assets. The Bank and the Debtor both believed that not only was the Debtor then insolvent, but that the Bank was substantially undersecured. The Debtor and the Bank instituted serious negotiations following the Debtor's default in May 1989 of an interest payment due the Bank and the Bank's acceleration of all obligations and demand for immediate payment. The Debtor's directors and stockholders, most of whom were investment bankers who had acquired the Debtor in January 1988, became dissatisfied with the negotiations and in July 1989 voted that the Debtor file a

chapter 7 bankruptcy petition. This action caused the parties to have further discussions which culminated in a written agreement (the Agreement) dated August 1, 1989. The Agreement provided that the Debtor would file a chapter 11 petition with "the ultimate aim of selling substantially all of the assets of Cuisinarts on a 'going-concern basis....'" The parties to the Agreement, in addition to the Bank, were five stockholders identified as The Consulting Group.[4] The Bank agreed to hire The Consulting Group to give advice and recommendations "in effecting ... the disposition of Cuisinarts or its assets" with a performance fee payable to The Consulting Group based on 11.25% of all sales proceeds in excess of 13 million dollars. The Agreement further provided that the signatories mutually released each other from all claims and that the Agreement would be subject to the approval of the bankruptcy court. In the event the bankruptcy court did not approve the Agreement, the parties agreed to use their best efforts to modify the Agreement to obtain such approval.[5] The Bank previously had advised The Consulting Group that only if the Debtor filed

---

**3.** § 503. *Allowance of administrative expenses.*

 . . . . .

 (b) After notice and a hearing, there shall be allowed administrative expenses, ... including—

 (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

 . . . . .

 (D) a creditor ... in making a substantial contribution in a case under chapter 9 or 11 of this title; or ...
 (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.
11 U.S.C. § 503(b)(3) & (4) (1988).

**4.** The Consulting Group consisted of Washington National Investment Corporation, Robert M. Fomon & Company, Inc., Barry Matthews Company, John Mack, and Morgan Guaranty Trust Company of New York, as trustee of a commingled trust.

**5.** The Bank's supplemental post-trial memorandum presents the Bank's view of the Agreement's background.

> The Debtor advised the Bank that it would file a Chapter 11 petition instead of a Chapter 7 petition if the Bank agreed, in effect, to pay a bribe to the shareholders in the form of a share of the proceeds from the sale of the Debtor. The Bank refused to do so, recognizing that such an arrangement would be inappropriate. The shareholders reformulated the proposal so that it constituted payment for consulting services to be rendered. That made the Agreement more palatable to the Bank, because the Bank and the Debtor both recognized that professional investment banking advice was needed in order to maximize the proceeds from the sale of the Debtor. However, the Bank remained sensitive to possible appearance of impropriety of such an arrangement, so the Bank insisted that the arrangement be expressly subject to court approval or otherwise be null and void. When the shareholders acquiesced to this condition, the Consulting Agreement was executed and the company filed for Chapter 11.

*Bank's Supplemental Post–Trial Memorandum,* at p. 5.

a chapter 11 petition, and not otherwise, would the Bank provide the Debtor with the additional funding necessary for the continued operation of the Debtor's business.

On August 2, 1989, the day after the Agreement was executed, the Debtor filed its chapter 11 petition. The court, on August 10, 1989, granted the motion of the United States Trustee to appoint a chapter 11 operating trustee. The motion alleged that "the Debtor was suffering extensive internal strife and limited operations." No party objected to the granting of this motion. The court, on August 14, 1989, approved the appointment of Mark I. Fishman, Esq. as chapter 11 trustee, and Fishman hired, with the court's approval, an experienced business consultant, Raleigh C. Minor, to aid him in operating the Debtor's business.

A preliminary financing order, agreed to by the Debtor as debtor in possession, entered on August 10, 1989 to sustain the business and provide adequate protection. The trustee and the Bank negotiated a final financing order, approved by the court on September 14, 1989. This order contained "carve outs" from the Bank's lien to provide, *inter alia,* compensation for the trustee, his attorney, and for Minor. The Bank utilized the services of Bingham, Dana & Gould (BD & G), a Boston law firm, and Hebb & Gitlin (H & G), a Hartford law firm.

The Bank, on or about August 16, 1989, retained under a written contract an investment banking firm to assist the Bank "in effecting the disposition and collection of the assets of Cuisinart...." The Bank hired Nightingale & Associates (N & A), a company that the Bank had utilized before in other troubled loan situations. Timothy M. Barns, a Bank vice-president, testified that when the Bank hired N & A, the Bank did not believe the proceeds from the sale of the Debtor's business would equal the Bank's debt then approximating $19,100,-000.00. Stephen Hopkins, an N & A vice-president, testified that the Bank retained N & A "to sell Cuisinart as quickly as possible."

The contract between the Bank and N & A called for payments to N & A on a biweekly basis at a per diem rate of $1,800.00 for William Nightingale, $1,600.00 for Stephen Hopkins, with lower rates for other named N & A personnel. In addition, the Bank agreed to pay N & A a performance fee upon the sale of the Debtor's assets based on 5% of the first million dollars of "Total Proceeds," 4% for the next million, 3% for the next million, 2% for the next million, and 1% for the balance. "Total Proceeds" were to exclude monies paid under the Agreement to The Consulting Group.

N & A undertook an extensive solicitation of offers for the Debtor's business and utilized, in part, a list of prospective buyers previously contacted by the Debtor's former management. N & A from time to time advised the Bank whether it was in the Bank's interest to comply with the trustee's requests under the financing order to fund inventory purchases. Hopkins testified that about 10% of N & A's time billed to the Bank was devoted to keeping the Bank informed about the operation of the Debtor's business.

On November 10, 1989, the trustee entered into a contract for the sale of the Debtor's business, excluding the accounts receivable, to CAIR Acquisition, Inc. (CAIR), a subsidiary of Conair Corporation, one of the companies originally contacted by the Debtor as a potential purchaser. Three days later, the court held a hearing on a motion filed on October 27, 1989 by The Consulting Group requesting court approval of the Agreement. Bank's counsel appearing at the hearing concurred with the statement of The Consulting Group's counsel that all payments to be made by the Bank for The Consulting Group's services, although not explicit in the Agreement, would not be added to the Bank's debt to be passed on to the Debtor's estate. The United States Trustee, the trustee and the unsecured creditors' committee (committee) objected to the propriety of the court approving a private arrangement between the Bank and members of the Debt-

or's board of directors. The court denied the motion.

The sales price to CAIR, dependent in part on the amount of inventory transferred on the sale date, may be approximately 20 million dollars. The trustee took advantage of the services of the Bank's attorneys in both negotiating and in consummating the sale to CAIR. From the sale proceeds, under a reservation of rights, the trustee paid the Bank the balances due on the prepetition and postpetition loans it had made to the Debtor. The Debtor's estate now approximates five million dollars realized from assets, such as the accounts receivable, not transferred to CAIR. The trustee has stated he intends to propose a plan utilizing principles of subordination and classification of claims to distribute the cash, after a final determination of the Bank's present application and of other administrative expenses.

In the application before the court, the Bank asserts it is entitled to reimbursement for the following sums paid: (1) to BD & G $219,897.50 for fees and $38,919.16 for disbursements, (2) to H & G $174,660.00 for fees and $12,683.76 for disbursements and (3) to N & A $565,667.00 for fees and $21,619.49 for disbursements. The trustee, the United States Trustee and the committee filed separate objections to the Bank's application and a two-day hearing was held.

## III.

## DISCUSSION

## A.

## REIMBURSEMENT OF MONIES BANK PAID TO NIGHTINGALE AND ASSOCIATES

### (1)

### Section 506(b)

"According to its legislative history, § 506(b) codifies pre-Code law that an oversecured creditor can assert, as part of its secured claim, its right to interest, fees and costs arising under its credit agreement." In re Salisbury, 58 B.R. 635, 637 (Bankr.D. Conn.1985) (citation omitted). To deter-

mine whether the creditor is oversecured, while § 506(a) sets forth the general proposition that the value of the collateral should "be determined in light of the purpose of the valuation and the proposed disposition" of such collateral, § 506(a) does not set the date as of which the collateral is to be valued. See In re Beard, 108 B.R. 322 (Bankr.N.D.Ala.1989).

The objecting parties contend that the date for valuing the debtor's business should be the petition date, and the valuation standard should be a liquidation standard. Because at the time of the filing the Bank concededly believed its debt exceeded the value of its collateral, the objecting parties urge that the Bank be determined at all relevant times to be an undersecured creditor and not entitled to reimbursement of fees and costs arising under its credit agreement. The Bank, on the other hand, argues that the date of the signing of the contract of sale should be the appropriate valuation date with the value obviously equalling the contract price. The Bank thereby would be entitled to the benefits of the status of an oversecured creditor. The Bank further contends that even if the petition date is to be used to value its collateral, the contract price arrived at only three months later should still control.

Because I find persuasive the Bank's position that the contract price should set the value of the debtor's assets, whether the petition or the contract of sale date is selected, there is no need in this proceeding to choose between them. The debtor, at the filing, was operating its business, albeit minimally, and the sale price of that business established but three months later is by far the best evidence of its value on the petition date. Although the objecting parties insist the business appreciated in value after the petition date, there is no basis in the record to sustain such a finding. The trustee and Minor, from August 16, 1989 to November 10, 1989, efficiently and expertly operated the debtor's business, but I do not believe their stewardship caused the debtor's value to increase in the relatively brief period in question. As the committee's post-trial memorandum points out: "The

essence of the value of the debtor's assets was the Cuisinarts name." It was the utilization of the bankruptcy process, including the benefit of the automatic stay, which permitted the debtor to maintain its going-concern value. I conclude the Bank is entitled as an oversecured creditor to charge its collateral with its fees and costs if its credit agreement authorizes the recovery of such expenses and they are reasonable. *In re Wonder Corp. of Am.*, 82 B.R. 186 (D.Conn.1988).

For reimbursement of the N & A expense, the Bank asserts the following paragraph contained in its prepetition credit agreement supports its claim:

§ 11. EXPENSES. Whether or not the transactions contemplated hereby shall be consummated, the Company will pay ... (c) all reasonable out-of-pocket expenses (including reasonable attorneys' fees and costs) incurred by the Bank in connection with (i) the enforcement of this Agreement, the Notes and the other Loan Documents against the Company or the administration thereof after the occurrence of a Default or Event of Default and (ii) in connection with any litigation, proceeding or dispute whether arising hereunder or otherwise, in any way related to the Bank's relationship (as lender but not as an affiliate of a stockholder) with the Company hereunder or under any predecessor financing agreement....

The Bank is unable to cite any authority, in or out of a bankruptcy context, where like provisions have been construed to allow a lender to retain an investment banker and charge the borrower, and the court has located none. Contractual provisions for the payment of attorney's fees and other associated costs are to be strictly construed, *In re United Nesco Container Corp.*, 68 B.R. 970, 974 (Bankr.E.D.Pa. 1987); *In re Samsa*, 86 B.R. 863, 867 (Bankr.W.D.Pa.1988), and any ambiguities should be resolved against a creditor-drafter of the loan document. *In re Orsa Assoc., Inc.*, 106 B.R. 418, 423 (Bankr.E.D.Pa. 1989). To the extent that the cited paragraph may be claimed to be equivocal, un-

certain or ambiguous, the Bank presented no evidence that the hiring of an investment banker was within the contemplation of the parties when they executed the credit agreement. I conclude that paragraph 11 does not support reimbursement to a secured creditor for an investment banker hired to find a buyer for a business which the borrower continues to operate.

The Bank further refers to the final financing order entered on September 14, 1989 as encompassing its hiring an investment banker. Paragraph 4(e) of this order requires that the Bank shall apply the prepetition cash collateral it receives, *inter alia*, "to contractual costs, expenses and attorney's fees incurred by the Bank on and after the Petition Date, subject to Court approval." When one takes into account that on September 14, 1989 N & A's services had been in place for almost a month, and that the Bank failed to specify such services as reimbursable in the submitted financing order, this Bank argument is unpersuasive.

The Bank in its post-trial memorandum argues for the reasonableness of the N & A fees totaling $587,286.49 and makes the following statement:

If this Court had approved the Consulting Agreement, the shareholders, many of whom were quite familiar with investment banking, would have been paid a fee of approximately $770,000 based on the sale to Conair. If Richard Bodman [investment banker with Washington National Investment Company], Robert Fomon [former chairman of E.F. Hutton] and Morgan Guaranty Trust Company considered a $770,000 fee to be reasonable for the sale of the Debtor, the reasonableness of N & A's ultimate $587,-287.49 [sic] sale fee cannot seriously be questioned.

*Bank's Post–Trial Memorandum*, at p. 17 (footnote and citation omitted). The trustee, in his post-trial memorandum (pp. 8–10), responds to this assertion by noting, in effect, that the court in not approving the Agreement with The Consulting Group spared the Bank from being liable for a nonreimbursable $770,000.00 charge. The

trustee contends that the significantly lower fee of N & A should remain the Bank's sole responsibility in light of the Bank's willingness to be responsible without charge to the estate for the comparable services of The Consulting Group at a higher fee. I agree. Therefore, even if the Bank's prepetition or postpetition loan documents could be construed to include Debtor responsibility for N & A's services, the court would not order reimbursement.

## (2)
### Section 503(b)

 The Bank argues that it is entitled to reimbursement of the N & A expense under § 503(b) which authorizes as an administrative expense the payment of the "actual, necessary expenses ... incurred by ... (D) a creditor ... in making a substantial contribution" in a chapter 11 case. Because administrative expenses are given priority status by § 507(a)(1) and deplete the funds available to general unsecured creditors, administrative expenses must be given strict scrutiny by the court. *In re Patch Graphics*, 58 Bankr. 743, 745 (Bankr.W.D.Wis.1986). Creditors are presumed to act primarily in their own interests and not for the benefit of the estate as a whole, *In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr.S.D.N.Y.1989); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 571 (Bankr.D.Utah 1985), and case law to date is clear that "[e]fforts undertaken by a creditor solely to further his own self-interest ... will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate." *In re Lister*, 846 F.2d 55, 57 (10th Cir.1988); *see In re D.W. G.K. Restaurants, Inc.*, 84 B.R. 684, 689 (Bankr.S.D.Cal.1988).

 As noted earlier in this ruling, N & A was hired for the sole purpose of protecting the interest of the Bank; N & A reported to the Bank on the trustee's activities and advised the Bank concerning the trustee's funding requests. The Bank expressly chose not to have the estate employ N & A

as a professional person with undivided loyalty to the estate and provide payment for such services in the "carve out" provisions of the financing order. Furthermore, the trustee's argument concerning the Bank's being relieved from the payment to The Consulting Group is as persuasive under § 503(b) as under § 506(b). In light of all these circumstances, I conclude the N & A expenses cannot be treated as an administrative expense of the estate.

### B.

### REIMBURSEMENT OF MONIES PAID TO BANK'S ATTORNEYS

 The trustee does not oppose the Bank's attorneys' fees reimbursement request except for fees applicable to the drafting of the postpetition loan documents. The court concludes that these services are reimbursable.

The United States Trustee agrees that compensation pursuant to § 503(b) is in order, but objects to the payment for attorney time spent on travel, drafting fee applications, and for undocumented expenses. *See* Local Bankr.R. 25(a)(5) (1988) (undocumented expenses not reimbursable); *In re Choice Vend, Inc.*, No. 2–81–01305, slip op. at 14–17 (Bankr.D.Conn.1983) (fee application time not compensable under § 330). In its post-trial memorandum, the Bank addresses only the issue of payment for time spent by H & G in preparing its fee application. I find the Bank's argument that §§ 506(b) and 503(b)(3) and (4) should permit compensating attorneys for preparing fee applications, even if § 330 does not, unconvincing and, therefore, the United States Trustee's objection to such payment is sustained. Since the Bank did not address the other payment issues, these objections also are sustained. *In re Danise*, 112 B.R. 492, 495 (Bankr.D.Conn.1990).[6] The United States Trustee also questions the mixed hourly rate billed by the law firms (approximately $180.00 per firm), but

---

**6.** Specifically deducted with regard to H & G are 32.9 hours of travel time ($5,385.89), 37.9 hours for preparation of fee application ($6,908.79) and undocumented expenses of $12,- 683.76. With regard to BD & G, 56 hours of travel time ($9,984.24) and undocumented expenses of $38,919.16 are deducted.

I conclude this rate charged the Bank is not unreasonable under the circumstances.

The committee would have the court deny reimbursement of all expenses claimed by the Bank, contending that the Bank was an undersecured creditor under § 506(b) and made no substantial contribution to the case under § 503(b). The committee argues if the Bank is found oversecured, the provisions of paragraph 11 of the credit agreement do not support reimbursement of the Bank's attorney charges for the "prepetition negotiations with the Debtor which led to the filing of the chapter 11 petition" because the "Bank did not commence or pursue any litigation against the Debtor to enforce the Agreement or to foreclose on its security interest." *Committee Memorandum*, at p. 21. Paragraph 11 is not so limited.

The debtor agreed in paragraph 11 to pay "reasonable out-of-pocket expenses (including reasonable attorneys' fees and costs) incurred by the Bank in connection with (i) the enforcement of this Agreement … or the administration thereof after the occurrence of a Default or Event of Default." The Bank engaged attorney services after the debtor's default, and, with one exception, they apparently were not incurred for reasons unrelated to protection of the debt. The exception concerns services involved with the negotiation and drafting of the contract with The Consulting Group whereby selective stockholders of the debtor were to be paid for investment banking functions. Since I have previously determined that hiring of investment bankers does not come within the provisions of paragraph 11, neither should the attorneys' fees connected with that activity.[7] Further, the Bank has conceded that there was no intent to have the charges involved with the Agreement assessed against the debtor. *Cf. In re Continental Vending Machine Corp.*, 543 F.2d 986, 994 (2d Cir.1976) (lender's attorney's fees not reimbursable where incurred to prepare lender's officers for deposition in suit by lender against debtor's officers.) The *Continental* court emphasized that lender reimbursement clauses must be subject to a rule of reason, and much is left to the discretion of the trial judge. *Id.* at 994. The prepetition expense for H & G fees comes to $36,327.50, and for BD & G $36,551.00. I conclude that 15% of these fees ($5,449.12 and $5,482.65, respectively) do not qualify for reimbursement.

Accordingly, the sums of $156,916.20 for the services of H & G and $204,430.61 for the services of BD & G are approved for reimbursement to the Bank.[8]

7. The Bank describes some of the services of their attorneys in the prepetition period as follows:

H & G provided analysis and comments to the Bank on the proposed arrangements with the Debtor's shareholders and management from a bankruptcy point of view in order that the Bank might protect itself against potential allegations that it had acted improperly in agreeing to such arrangements with the shareholders and management.

*Bank's Pre–Trial Memorandum*, at p. 6.

8. At the commencement of this case, the court stated that certain paragraphs in the proposed preliminary financing order the Bank submitted were incompatible with chapter 11 principles. The court questioned provisions that: (1) restricted the estate from using any of the monies derived from Bank funding to exercise its statutory powers in investigating the validity of the Bank's claims, and (2) requiring that the estate pay to the Bank interest on its entire prepetition debt if the debt proved to be undersecured. The Bank agreed to modify substantially the first provision and drop the second. The court, at the conclusion of the present hearing, requested that the parties consider the issue of the place of financing orders in the control of a chapter 11 case. The Bank filed a supplemental post-trial memorandum devoted, in part, to defending what it construed to be questioning by the court of the "Bank's and the Professionals' integrity." The court has never questioned any party's integrity in this case. The court's concerns, perhaps inartfully expressed, have since been directly addressed by Judge James F. Queenan, Jr. in *In re Tenny Village Co., Inc.*, 104 B.R. 562, 569 (Bankr.D.N.H.1989) ("It is said that a chapter 11 lender should not be required to finance the prosecution of claims and defenses against it. That is true. If the lender believes that this will occur, it can elect not to make the loan. It cannot expect, however, to change the rules of a Chapter 11 case."), and by Judge Howard C. Buschman III in *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr.S.D.N.Y.1990) ("[C]ourts have focused their attention on proposed terms [of postpetition financing] that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by

## IV.

### CONCLUSION

The application of The First National Bank of Boston for reimbursement of $1,033,446.91 for costs and expenses is granted to the extent of $361,346.81 and denied as to the balance.

preventing motions by parties-in-interest from being decided on their merits.").