In re MID–STATE RACEWAY, INC., Debtor.

v.

In re Mid–State Development Corporation, Debtor.

Nos. 04–65746, 04–65745.

United States Bankruptcy Court, N.D. New York.

Feb. 11, 2005.

---

**5.** Count Three of the Complaint was previous-

ly withdrawn by the Plaintiff.

42

Harris Beach LLP (David M. Capriotti, Lee E. Woodard, of counsel), Syracuse, NY, for debtor.

Menter, Rudin & Trivelpiece, P.C. (Mitchell J. Katz, Esq., Jeffrey A. Dove, Esq., of counsel), Syracuse, NY, for Vestin Mortgage, Inc.

Lackey Hershman LLP (Deborah Deitsch–Perez, Esq., of counsel), Dallas, TX, for All Vernon Acquisition, LLC.

The Towne Law Offices, P.C. (Michael Rhodes–Devey, Esq., James T. Towne, Esq.), Albany, NY, for Jeffrey Gural.

Pryor Cashman Sherman & Flynn LLP (Tina Niehold Moss, Esq., Dallas L. Albaugh, Esq., of counsel), New York City, for Raceway Ventures, LLC.

Green & Seifter, PLLC (Michael J. Balanoff, Esq., of counsel), Syracuse, NY, for Harness Horse Association of Central New York.

Hancock & Estabrook, LLP (Stephen A. Donato, Esq., of counsel), Syracuse, NY, for Official Committee of Unsecured Creditors.

Mc Namee, Lochner, Titus & Williams (Peter A. Pastore, of counsel), Albany, NY, for The Renaissance Companies, Inc., Esq.

Bond, Schoeneck & King, PLLC (Joseph Zagraniczny, Esq., of counsel), Syracuse, NY, for VIP Structures, Inc.

Costello, Cooney & Fearon, PLLC (Anthony R. Hanley, Esq., of counsel), for County of Oneida.

E. Lisa Tang, Esq., Delmar, NY, for Dominick Giambona.

Simpson Thacher & Bartlett (James G. Gamble, Esq., of counsel), New York City, for § 1104 Trustee Richard Breeden.

Guy A. Van Baalen, Esq., Utica, NY, Assistant U.S. Trustee.

**MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**

STEPHEN D. GERLING, Chief Judge.

Under consideration by the Court is a motion ("Motion") filed on January 20,

2005, by Mid–State Raceway, Inc. ("Debtor" or "Mid–State Raceway") and Mid–State Development Corporation (hereinafter jointly referred to as the "Debtors" seeking approval of postpetition financing to be provided by Jeffrey Gural ("Gural") pursuant to § 364(c) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 ("Code")). Opposition to the Motion was filed on behalf of All Vernon Acquisition, LLC ("AVA") on January 21, 2005 and on behalf of Vestin Mortgage, Inc. ("Vestin") on January 24, 2005. There were also responses filed by VIP Structures, Inc. ("VIP") and the Harness Horse Association of Central New York, Inc. ("Horse Association"), both filed on January 21, 2001, expressing limited objections for purposes of protecting their respective rights. Richard C. Breeden, Chapter 11 trustee for The Bennett Funding Group, Inc. ("Breeden"), filed a response in support of the Motion on January 21, 2005, and Dominick A. Giambona ("Giambona") filed a response in support of the Motion on January 24, 2005.

Based on representations by the Debtors that they required interim funding to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."), the Motion was heard on shortened notice.

The parties were notified that the Court intended to conduct an evidentiary hearing on January 24, 2005. The hearing, which was commenced on January 24th, was continued on February 2, 2005, and also on February 3, 2005.[1] Following the testimony of several witnesses, as well as the admission of various exhibits and stipulations, the Court afforded the interested parties an opportunity to submit memoranda of law by February 8, 2005. The matter was submitted for decision that date.

### *JURISDICTIONAL STATEMENT*

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A), (D) and (O).

### *FACTS*

*Interested Parties*

The Debtors filed voluntary petitions pursuant to chapter 11 of the Code on August 11, 2004.[2] On August 12, 2004, the Court signed an Order granting joint administration of the two cases. Mid–State Raceway owns all of the stock of Mid–State Development. Mid–State Raceway operated the Vernon Downs racetrack in

---

**1.** At the end of the hearing on January 24th, Gural and Idaho Horizons Investments, LLC ("Idaho Horizons") agreed that each would advance $75,000 to the Debtors, or a total of $150,000, on an emergency basis so as to allow their continued operations while the hearing was continued. At the hearing held on February 3, 2005, the two agreed to an additional $35,000 each. *See* February 3rd Transcript ("Tr.") at 138. The Debtors presented a budget which reflects the initial emergency funding of $150,000. *See* Debtors' Exhibit D. They also submitted budgets for the week of January 31, 2005 to February 6, 2005 and February 7, 2005 to February 13, 2005, which served as a basis for the agreement to provide the additional $70,000 in

emergency funding. *See* Debtors' Exhibits E and F. On February 10, 2005, the Court signed Orders memorializing these arrangements for emergency financing.

**2.** An involuntary chapter 11 petition had been filed against the Debtor in the U.S. Bankruptcy Court for the District of Nevada on August 9, 2004 (Case No. 04–52382). The filing in the Northern District of New York was in response to the involuntary petition. The involuntary case was dismissed by Order of the Nevada Bankruptcy Court on September 29, 2004, and the case was closed on November 2, 2004.

Vernon, New York,[3] and Mid–State Development operates an adjacent hotel, food and proposed video gaming business. Mid–State Raceway owns the real property on which the hotel is operated.

Vestin is the primary secured creditor of both Debtors. Vestin has asserted that it holds an allowed claim of over $26 million secured by a first lien on all of the Debtors' real and personal property. Since the filing of the cases, the Debtors and Vestin have entered into a series of stipulations for the use of cash collateral, which have provided for rollover security interests to Vestin. The Vestin loan is guaranteed by Shawn Scott ("Scott").[4] Vestin opposes the Debtors' Motion.

AVA, an entity owned by Scott, is the alleged owner of 52% of the issued and outstanding shares of the Debtors as a result of its purchase of the shares at a foreclosure sale sometime after September 2004 when Raceway Ventures, LLC, which at some point had purchased the shares from various Scott entities, allegedly defaulted on its obligations to those Scott entities.

Breeden, as chapter 11 trustee of The Bennett Funding Group, Inc., asserts that he holds an interest in 164,657 shares of the Debtors' stock.[5] Breeden supports the Debtors' Motion.

The Horse Association, as the duly authorized association of owners, racers and drivers of harness horses at Vernon Downs, asserts a claim against the Debtor of approximately $475,000 for unpaid purses pursuant to the terms of an agreement entered into with the Debtor on December 1, 2003. The Horse Association filed a limited objection to the Debtors' Motion requesting that if it is granted, that any Order provide that its rights are in no way prejudiced.

VIP asserts that it holds a secured claim against the Debtors in the amount of $807,998.93 in connection with design and construction work it performed on behalf of the Debtor. It supports the Debtors' Motion.

The Official Committee of Unsecured Creditors ("CC") was appointed by the United States Trustee on October 28, 2004. On January 31, 2005, following the initial hearing on the Motion, the CC filed a statement indicating its support for the Debtors' Motion provided it was able to negotiate an acceptable proposal that provided for improved treatment of the general unsecured creditor claims.

*Board of Directors of the Debtor*

The Debtor's Bylaws, as revised through August 13, 1998, provide that "[t]he number of directors of the Corporation shall be determined from time to time by the Board of Directors, but shall not be less than nine nor more than twelve." *See* Vestin's Exhibit 12 at ¶ 7. The Bylaws also provide that "[n]o director shall participate in the affairs of the Corporation unless such director shall have received an appropriate occupational license from the New York State Racing and Wagering Board,

---

**3.** Allegedly, horseracing and simulcasting operations ceased on July 23, 2004, when the Debtor's licenses were suspended.

**4.** At the hearing on February 2, 2005, the Debtors, Vestin and AVA entered into a stipulation which provides that for purposes of this Motion, Scott is not an owner, director or shareholder of Vestin and that no entities controlled by Scott is an owner, director or shareholder of Vestin. *See* February 2nd Tr. at 82–83.

**5.** In response to a motion in this case filed by Vestin seeking relief from the automatic stay, Breeden acknowledged that 126, 657 of the shares are subject to a dispute. *See* Response of Trustee, filed December 29, 2004, at 3 and Footnote 2.

and maintains such license in good standing.... In the event a director fails to obtain or maintain a license for a period of 30 days after written notice thereof by the Secretary of the Corporation, then such director shall be removed by the Board of Directors for cause." *Id.*

As of January 24, 2005, the Debtor's Board of Directors was comprised of five individuals, including Paul Noyes ("Noyes"), President of the Debtor and Chairman of the Board; Justice Cheney ("Cheney"), Chief Executive Officer of the Debtor; Andrew Kiley ("Kiley"); James Klein ("Klein") and Dominick Giambona. At the hearing on February 2, 2005, the Debtor, Vestin and AVA stipulated that John Alderfer ("Alderfer") was elected to the Board on December 15, 2004.[6] According to the minutes of the Board for that date, Woodard had recommended the addition of Alderfer to the Board. *See* Vestin's Exhibit 11. The minutes also note that Alderfer had to obtain clearance from the R & W Board in order to participate on the Board. By letter, dated December 17, 2004, Noyes informed Alderfer of his election to the Board. *See* Vestin's Exhibit 6. In the letter from Noyes, he

also states that "I believe you have to get clearance with the New York State Racing and Wagering Board before you can act." On January 14, 2005, the Board voted to "rescind" its prior election of Alderfer to the Board. *See* Vestin's Exhibit 10. In the minutes of the Board meeting of that date, it is stated that "to the best of the Board's knowledge, he [Alderfer] has not been cleared by the NYS Racing and Wagering Board.[7] This clearance is required by Mid–State's By–Laws. MOTION by Mr. Kiley and seconded by Mr. Klein, it is carried without objection that that motion of December 15 is hereby rescinded." *Id.*

*Debtor in Possession ("DIP") Financing Proposals*

In the minutes of a Special Meeting of the Board of Directors on December 15, 2004, the Board[8] considered several proposals by entities interested in either buying or reorganizing the Debtor. *See* Vestin's Exhibit 11. The Board authorized Woodard to proceed with negotiations on a proposal made by Casinopartners Management [US], Inc. (Eddie Lynn) ("Casinopartners"). *Id.* The reasons given for

---

6. On November 9, 2004, Alderfer submitted his application for licensure with the New York Racing and Wagering Board ("R & W Board") to Lee Woodard, Esq. ("Woodard"), Debtors' counsel. *See* Vestin's Exhibits 4 and 8. On November 10, 2004, Woodard forwarded Alderfer's application to the R & W Board. However, no resolution of the Debtor's Board concerning Alderfer's election to the Board on December 15, 2004 was ever submitted to the R & W Board. *See* February 2nd Tr. at 75–81. Woodard stipulated that he was informed by either AVA's or Vestin's counsel that the R & W Board had requested a resolution before it would issue a license and that he had not sent one to the R & W Board. *Id.* at 81.

7. Klein testified that he had personally called the R & W Board and was told that there was "no status" on any application of Alderfer.

*See* February 2nd Tr. at 60. Noyes also testified at the hearing held on February 2, 2005, that he had placed a call to the R & W Board prior to the meeting of January 14, 2005, concerning the status of Alderfer's application and was told that nothing had been received. *See id.* at 141–42. Noyes testified that he had concluded that Alderfer no longer had an interest in joining the Board based on his understanding that Alderfer had recently accepted increased responsibilities at Vestin. *See id.* at 142. According to Noyes, he was unaware that Woodard had submitted Alderfer's application to the R & W Board in November 2004. *Id.*

8. Andrew Kiley was absent from the meeting of the Board on December 15, 2005. Woodard, as well as James Wise ("Wise"), Debtor's Treasurer and Chief Financial Officer, were also present.

favoring the Casinopartners' proposal included: (1) it was a sale rather than a plan of reorganization; (2) the terms were acceptable to Vestin; (3) there was a reasonable anticipation of a full racing season in 2005 as the closing of the sale was anticipated to be March 1, 2005; (4) Mr. Eddie Lynn, one of the partners, has experience in managing a horseracing track, casino and hotel; (5) good indication that Casinopartners is "legitimate;" (6) belief that Casinopartners and its financial backers will have "clear sailing at the racing board and lottery board of New York State;" (7) immediate DIP financing of $500,000 to cover expenses until closing; (8) "legitimate unsecured creditors will be paid in full;" and (9) other interested parties would still be entitled to participate in the bidding process in the Court. *Id.*

By letter dated January 14, 2005 and addressed to Woodard, Gural submitted a proposal ("Gural Offer"),[9] which is the subject of this Motion. *See* Debtor's Exhibit B. Cheney testified that it was received at a time when the Debtor was "about a week out of having to tell everyone else to go home" because the Debtors had no money for payroll. *See* January 24th Tr. at 28–29. According to Cheney, it was for that reason that the Board felt compelled to act quickly in considering the Gural Offer. *Id.* at 30. The Gural Offer was considered and approved by the Board at a meeting held on January 14, 2005 at 1:10 p.m. and attended by all five Board members,[10] as well as Wise and Woodard.[11] *See* Vestin's Exhibit 10. The Gural Offer includes the following provisions:

Funding of not less than $1.2 million and not more than $8.5 million, comprised of:

$1.2 Million for day to day operations pending confirmation ("Working Capital Loan"), the principal of which is to be converted to 18% of the common stock of the "reorganized Debtors." In the event that "the Plan" as described in the letter is not confirmed, the loan is to be treated and repaid as an allowed administrative claim;

$1.5 million for necessary capital improvements (Video Lottery Terminals) ("Capital Improvement Loan"), contingent upon approval of certain legislation[12] with the principal being converted

---

**9.** The Gural Offer makes reference to the fact that prior offers had been made by Gural on January 10, 2005 and January 11, 2005, which allegedly had been rejected by the Debtors. *See* Debtor's Exhibit B.

**10.** Giambona, Klein and Woodard were present by conference call. Cheney testified that Giambona abstained from the vote as he had not wanted to appear that there was a conflict given that he had been the individual that had first approached Gural about the possibility of a relationship with the Debtor and did not want to be viewed as being behind the Gural Offer. *See* January 24th Tr. at 58. Thus, the vote was made by the four other members of the Board.

**11.** As a result of having accepted the Gural Offer, the Board rejected the proposal of Casinopartners and one made by Eric Spector of Oneida Capital, LLC. *See* Vestin's Exhibit 10.

Spector's offer apparently provided for DIP funding, a plan of reorganization and a § 1104 trustee. *See* Vestin's Exhibit 11. However, according to Cheney's testimony, it required due diligence which would have caused a delay. *See* January 24th Tr. at 23.

**12.** At the hearing on February 3, 2005, the Court heard the testimony of Georgio DeRosa ("DeRosa"), a partner in a government relations firm and a lobbyist for the past 15 years. *See* February 3rd Tr. at 62. The Court qualified him as an expert. *See id.* at 78. He testified that he had been tracking the video lottery terminal ("VLT") legislation since 2001 when it was first introduced. *Id.* at 62–63. According to DeRosa, as of January 14, 2005, when the Board of Directors had accepted the Gural Offer, no VLT bill had been reintroduced in the current New York State legislative session. *Id.* at 88. He expressed the belief that no legislation would be intro-

upon confirmation to 22% of the "reorganized Debtors;"[13]

Equity investment of $2.8 million in consideration for issuance of 40% of the common stock of the "reorganized Debtors" ("Confirmation Investment") to be used to fund the Plan;

and $3 million secured by a lien against all real and personal property of the reorganized Debtors, subordinate to all senior liens as allowed and determined pursuant to Code § 506 and provided under the confirmed Plan ("Post-confirmation Loan") to be used for working capital to fund the opening and operation of the post-confirmation racing and wagering by the reorganized Debtors.

Gural Offer at pages 1–2. In addition, upon confirmation of the Plan of Reorganization, as described at ¶ V of the Gural Offer, Gural was given the option of electing to convert either or both of the "DIP loans" to the common stock of the reorganized Debtor, which would have involved the issuance of either 18%, or 22%, or a total of 40% of the stock. *See id.* at ¶ II.B.5. Ultimately, Gural was entitled to the issuance of 80% of the common stock of the reorganized Debtors under the terms of the Gural Offer and prepetition shareholders, of which Gural was one,

would hold, pro rata, 20% of the issued stock of the reorganized Debtors.

There is also a provision in the Gural Offer under which the Working Capital Loan, as well as the Capital Improvement Loan, were to be secured by (1) a senior lien pursuant to Code § 364(c)(2) on unencumbered property of the estate; (2) a junior lien pursuant to Code § 364(c)(3) on encumbered property of the estate; and (3) an allowed super priority administrative expense claim pursuant to Code § 364(c)(1).[14] *See id.* at ¶ II.A.

The Gural Offer was to expire on January 14, 2005 at 8:00 p.m., unless accepted by the Debtors, as evidenced by signatures by facsimile received by Gural no later than 10:30 a.m. on January 15, 2005, of Debtors' counsel, Debtors' president or other authorized corporate officer and the Chairman of the Board of Directors or other authorized Director.[15] *See id.* at ¶ I.A. The Gural Offer also allowed Gural to extend or waive any contingency, expiration date or deadline, with any such extension or waiver being in writing and effective upon delivery to Debtor's counsel. *Id.* at ¶ I.B.

Under the terms of the Gural Offer, authorization was required by the Board of

---

duced until a decision was rendered by the New York Court of Appeals. It was DeRosa's testimony that the Court of Appeals was not scheduled to hear the appeal dealing with the constitutionality of the existing law introduced in 2001 until March 2005. *Id.* at 80.

**13.** According to the Gural Offer, the Working Capital Loan and Capital Improvement Loan are considered "DIP Lending" pursuant to Code § 364(c). *See* Gural Offer at ¶ 3.

**14.** At the hearing on January 24, 2005, Vestin asserted that it has a superpriority administrative expense claim with respect to $100,000 in unrestricted cash held by the Debtors at the time of their filing. *See* January 24th Tr. at 10. According to representa-

tions made by the Debtors in their Motion, it is assumed that those monies have been depleted. If, as Vestin asserts, it holds a superpriority administrative expense claim, this should not prevent Gural from also obtaining one pursuant to Code § 364(c)(1). *See In re Easton Tire Co. of Kirkwood,* 35 B.R. 492, 493 (Bankr.E.D.Mo.1983) (recognizing the possibility of multiple super-priorities that would share pro rata distributions to the extent that the monies allowed the debtor to operate its business and was found to be in the best interest of the general creditors).

**15.** The Gural Offer contains the signatures of Woodard (undated), Cheney (undated) and Noyes, dated January 14, 2005. *See* Debtor's Exhibit B.

Directors, as well as by the Debtors' shareholders if so required in the Bylaws. If not required, Debtors were to provide the letter of counsel stating that such authorization was not required. These were to be provided "not later than 6:00 p.m. on the last business day preceding the original return date of Debtors' motion for approval of lending." *Id.* at ¶ I.B.1.(a). No such letter from counsel was offered into evidence at the hearings.[16]

The Working Capital Loan is not contingent on the approval of any legislation. However, the Capital Improvement Loan, Confirmation Investment and Postconfirmation Loan are contingent on the passage of legislation which would permit the operation of video lottery gaming at Vernon Downs. *Id.* at ¶ I.B.2.(a). The three are also contingent on rejection by the Debtors of any contracts with the Vernon Downs horsemen and agreement by the horsemen to a new contract which includes a maximum of 96 race days and a division of net revenue to the track operations commensurate with similar size New York harness tracks. *Id.* at ¶ I.B.2.(b)

Gural may in his sole discretion terminate his funding commitment, *inter alia,* if Vestin obtains stay relief or a chapter 11 trustee is appointed or any other motion that materially alters the considerations provided for in the agreement or that renders the Funding Commitment impossible to perform. *See id.* at ¶ I.D.a. There is also a provision that

> in the event a part of the terms shall be voided by condition, contingency or Court Order, the Lender may in his sole discretion elect to sever such void provision and the remaining provisions shall

be enforceable and binding consistent therewith.

*Id.* at page 2(top).

Among the disclosures made by Gural is the fact that he holds pre-petition stock of the Debtors, which does not constitute a controlling interest with respect to the management and control of the Debtors. He has also been a plaintiff in an action or proceedings against the Debtors which have either been resolved or are stayed by virtue of the automatic stay. *Id.* at ¶ I.E.

There is a provision that upon acceptance of the offer and the filing of a motion for approval, Gural has agreed to advance not less than $50,000 and not more than $200,000 as part of the Working Capital Loan. The motion is to include nunc pro tunc Court approval of any amounts advanced or which might reasonably be expected to be advanced prior to the entry of a non-appealable final Order approving the lending. "If lending approval is denied, Debtors shall in any event use its [sic] best efforts to obtain approval of the funds advanced in good faith pursuant hereto." *Id.* at ¶ II.B.4.

Under the terms of the Gural Offer, he is to provide day-to-day management services, including the provision of a CEO, designated by Gural and approved by the Debtors, as well as the Court. Gural will contribute or directly pay the CEO up to $30,000 per month. *Id.* at ¶ II.7. There are other forms of additional compensation, including room and board at the Debtors' hotel facilities. *Id.* Gural will also have the right to designate two members of the Board of Directors, in addition to the existing directors, thereby increasing the number if necessary. *Id.*

The Gural Offer requires that the Debtors prepare and file not later than March

---

**16.** At the hearing on February 3, 2005, Gural's counsel indicated that he was authorized to waive any deadlines that had not been complied with by Debtors.

31, 2005, a Plan and Disclosure Statement "which shall provide for treatment of the DIP Lending, Confirmation Investment and Post-confirmation Loan in accordance with the terms hereof ...." *Id.* at ¶ V. Prior to filing the Plan and Disclosure Statement, the Debtors' counsel is to consult with Gural's counsel, although the Debtors shall have final discretion as to all terms, subject to the conditions set forth in this agreement.

Gural's intent in making the Confirmation Investment allegedly is to see that the proposed reorganization is feasible. There is to be $800,000 available for administrative claims, including payment of professionals, as well as expenses and costs associated with the issuance of the stock of the reorganized Debtors and compliance with all regulatory requirements. *Id.* at ¶ V.A.(1).

The secured mortgage claim of Vestin, together with the confirmation loan from it, shall be allowed in such amount as determined by the Court or by agreement with Vestin and is to be paid in full over not more than three years following the effective date. *Id.* at ¶ V.A.(2).

There are other provisions for the payment on the Horse Association's claim initially of $100,000 and the balance to be paid over three years. *Id.* at ¶ V.A.(6). Unsecured claims are to be paid from the Confirmation Investment, as is the claim of VIP. *Id.* at ¶ V.A.(5). Ultimately, unsecured claims are to be paid in full. However, the timing of payment of the balance owed after the Confirmation Investment is depleted is predicated on future payments not jeopardizing the "successful rehabilitation of the Debtor and the feasibility of Plan performance." *Id.* at ¶ V.A.(6).

By letter dated Sunday, January 16, 2005 and addressed to Woodard, an offer was received from Idaho Horizons [17] to provide total funding of $9 million in conjunction with the proposal by the Debtors of a chapter 11 plan of reorganizations ("Idaho Offer"). *See* AVA Exhibit 3. Despite the fact that the Board had already accepted the Gural Offer, Noyes testified that the Board had felt an obligation to consider the Idaho Offer since it was being made by the largest shareholder and by Vestin.

The Idaho Offer mimicked that of the Gural Offer in funding provisions, except that the post-confirmation loan had been increased from $3 million to $3.5 million. There is also a provision whereby the "Lender" shall elect to convert either or both of the DIP loans comprising the DIP lending to common stock. *See id.* at ¶ II.B.5. The proposal also provided for the retention of a CEO designated by the lender, as well as the election of two designees of the Lender to the Board and three designees of Vestin. The loan of $1.5 million for capital improvements was not contingent on passage of the VLT legislation. There is also a provision that any equity interest held by Scott be deposited and held in a blind trust until such time as he had received a valid receipt or track management license issued by the R & W Board.[18] *See id.* at ¶ I.E.4.

---

**17.** Horizons is owned by and/or is an obligor of Scott (including entities owned or controlled by him). The Idaho Proposal indicates that the "Lender" is "the guarantor of the Debtor's first mortgage obligation to Vestin and the guarantor of up to $500,000 of the Debtor's obligation to VIP Structures, Inc." *See* ¶ I.E.2 of the Idaho Proposal.

**18.** By letter dated December 12, 2003, Scott was notified by the R & W Board that it had refused to issue him a license to participate in racing in the State of New York based on a finding that he had made false statements in connection with his license application. It further stated that "Your experience, character and general fitness are such that your participation in racing or related activities

The Idaho Offer required the Debtors to file a plan and disclosure statement by February 28, 2005. In addition to a confirmation investment of $2.8 million, the Idaho Offer provided that $500,000 from its "post-confirmation loan" was to be used for plan distribution. It also capped Vestin's first mortgage claim at $27 million and provided for payment in full over not later than 30 months following the effective date of confirmation with an exit fee of $250,000 if paid in full within 15 months or $500,000 if paid after 15 months. *See* ¶ A.2 of the Idaho Offer. A initial payment of $100,000 at confirmation was proposed to be made to the Horsemen Association, with the balance paid in full amortized over a term of three years. *See* ¶ A.5 of the Idaho Offer.

In addition, unsecured creditors with claims of less than $2,000 would be paid in full, as would claimants with claims of more than $2,000 that were prepared to accept $2,000 in full payment. The balance of the unsecured claims would be paid on a pro rata basis in quarterly distributions from the postconfirmation (the agreement states "post-petition") operations of the Debtor until paid in full. *See id.* at ¶ V.A.7.(b). Idaho Horizons was given the option of terminating funding if an action was commenced in the name of or on behalf of the Debtor challenging the validity and/or enforceability of any obligations of the Debtor to Vestin. *See id.* at ¶ I.D.(g).

| Gural Offer | Idaho Offer |
|---|---|
| 1. $8.5 million in total funding | $9 million in total funding |
| 2. $1.5 million working capital | $1.5 million working capital |
| 3. $3 million postconfirmation loan | $3.5 million postconfirmation loan |
| 4. Rejection of Horsemen contract | No rejection of Horsemen contract |
| 5. No cap on Vestin's claim | Cap on Vestin's claim at $27 million |
| 6. $350,00—$360,00 available to unsecured creditors at confirmation | $1.2 million available to unsecured creditors at confirmation w/claims of < $2,000 being paid in full. |
| 7. Contingent on passage of legislation | Not contingent on passage of legislation |
| 8. Selection of CEO by Lender and Debtor | Selection of CEO by Lender and Debtor |
| 9. Lender had the option to convert loan(s) into equity | Lender required to convert loans into equity |
| 10. Ability to challenge the Vestin claim | Waiver of right to challenge the Vestin claim |
| 11. No exit fee on Vestin mortgage which was to be paid in 30 mos. of confirmation. | Exit fee of $250,000 if Vestin mortgage is paid within 15 months of confirmation; $500,000 exit fee if paid in > 15 months. |
| 12. Payment of $600,000 in real property taxes at confirmation | Payment of $200,000 in real property taxes at confirmation |

Despite the fact that the Board had previously accepted the Gural Offer, on the advice of counsel, it considered the Idaho Offer, which had been forwarded to Cheney by Woodard on January 17, 2005, at a Board of Directors meeting held on Wednesday, January 19, 2005. A comparison of the two proposals was performed by Wise, the Debtor's Treasurer and Chief Financial Officer, and presented to the Board at the meeting held on January 19, 2005. Wise acknowledged that he had not

would be inconsistent with the public interest, convenience or necessity, or with the best interests of racing generally." *See* AVA Exhibit 6. At the hearings, it was represented to

the Court that the determination of the R & W Board was currently being appealed and that hearings were ongoing in Albany, New York.

presented anything in writing to the Board at either the January 14th or January 19th meetings for purposes of discussion. *See* February 3rd Tr. at 51. He pointed out that there was no difference between the proposals as regards the $1.5 million in initial working capital. While acknowledging that the Idaho Offer provided $500,000 more in total funding, in his view this was offset by the fact that there was an exit fee of either $250,000 or $500,000 payable to Vestin depending on when its claim was paid. *Id.* at 33–34. He also agreed that under the Idaho Offer, more monies would be available upon confirmation for the unsecured creditors. While both proposals provided for $2.8 million in a post-confirmation loan, it was estimated that between $350,000—$360,000 would be available to unsecured creditors after the payment of certain other claims under the Gural Offer, as compared to approximately $1.2 million available under the Idaho Offer. *Id.* at 36. This was due in part to the payment of $600,000 in real property taxes at confirmation under the Gural Offer, versus $200,000 under the Idaho Offer. In making his presentation to the Board, he had understood, perhaps mistakenly, that all of the real property taxes had to be paid at confirmation. On cross-examination, he also indicated that he had not constructed a pro forma to determine whether the plan of reorganization presented in the Gural Offer was feasible, particularly given the provision which gave Gural discretion to convert the loans to equity. *Id.* at 53. Wise had not analyzed whether the Debtors could meet the debt service if Gural elected not to convert his loans to equity. *Id.* at 54. He also had not done an analysis of whether the Debtors could meet the Vestin debt. *Id.* at 53.

Wise testified that he viewed the fact that there was no cap on Vestin's claim under the terms of the Gural Offer as a positive factor as was the fact that there was to be no release of any claims the Debtors might have against Vestin or Scott. He admitted that the Board had not as yet done a formal analysis concerning the extent and validity of Vestin's claim; however, he indicated that it had come up for discussion by the Board. Klein also acknowledged that the Board had not done a formal analysis of the Vestin claim and felt it was not prudent to waive the Debtors' right to object to it, as proposed in the Idaho Offer, until one had been done. *See* February 2nd Tr. at 72, 74. Noyes also acknowledged that no analysis had been done on the extent of Vestin's claim. *Id.* at 174.

*Factors Considered by the Board of Directors with respect to the Gural Offer and the Idaho Offer*

The Court heard testimony from three of the members of the Board of Directors concerning their decision to accept the Gural Offer. Cheney testified that the Board's primary focus in considering the various offers had been on (1) whether the proposal would permit the Debtor to be up and running for the 2005 racing season and in this regard, that licensing by the R & W Board was a good possibility [19] and (2) to evaluate how the lender proposed to pay Vestin, the Horsemen Association and the unsecured creditors. *See* January 24th Tr. at 24–25. Klein testified that his "utmost concern during all of the deliberations" was to get the track back up and running. February 2nd Tr. at 23. Noyes also stressed the value of the Debtor as a going concern for the Spring 2005 racing season. *See id.* at 90. He also felt it

---

**19.** Debtor's license to operate the racetrack at Vernon Downs was suspended by the R & W Board in July 2004. *See* January 24th Tr. at

49. The Debtor had submitted an application for a license in November 2004 for the 2005 racing season. *Id.*

important to consider the economic strength of the buyer/lender as well as the buyer/lender's reputation and trustworthiness. *Id.* at 90–91.

Cheney testified that the Board had rejected Casinopartners' proposal in favor of the Gural offer because there was concern that Casinopartners was a recently formed corporation with no history and partners who were Canadian, which might cause a licensing problem. *See* January 24th Tr. at 26. There was no deal with Vestin included in the Casinopartners proposal and as it was an asset purchase proposal it was unlikely that there would be a racing season until 2006. *Id.* at 26–27.[20]

Both Cheney and Noyes testified that they favored accepting the Gural Offer on the basis that Gural was a business man with a good reputation and was also a breeder of harness horses. *See, e.g.,* February 2nd Tr. at 92. He was politically connected and involved with the legislative efforts concerning the VLTs. *Id.* at 92–93. Both believed that he would have a very good chance of obtaining a license from the R & W Board. *Id.* at 93. However, both Cheney and Noyes indicated that they had no objective basis for this belief and had not made any formal inquiry of the R & W Board prior to accepting the Gural Offer. In addition, Klein testified after speaking with Gural that he liked the direction Gural was taking with the VLT legislation and believed that it would eventually be passed. *See id.* at 24. Klein also pointed out that at the time that the Board had accepted the Gural Offer, the Idaho Offer

had not even been made. *See id.* at 57. It was the Board's belief that the Gural Offer was in the best interest of the Debtors, as well as the creditors and provided the best opportunity to be racing in 2005. *Id.* at 24.

While both Cheney and Noyes acknowledged that Scott already had a financial stake in the Debtor given his guarantee of the obligation to Vestin, they expressed concerns with the Idaho Offer and Scott and Vestin's involvement with it.[21] Cheney pointed out that Idaho Horizons was a new company, which had been formed by Scott in December 2004. *See* January 24th Tr. at 41–42. He indicated that he did not trust Scott and had serious concerns about Scott's ability to be licensed by the R & W Board. *See, e.g., id.* at 42. Klein admitted, on cross-examination, that the Board had not done any analysis concerning whether there would also be licensing problems with Gural and any partners he might have. *See* February 2nd Tr. at 67.

Noyes indicated that in his initial dealings with Scott he had trusted him, but gradually his trust had waned and presently he "strenuously" objects to any further involvement by Scott in the Debtor's operations. While acknowledging that Scott had fulfilled his past obligations,[22] he felt that there were always "ropes," rather than "strings" attached to any dealings with Scott, which made them particularly "sweet" for Scott but not so for the Debtors. *See id.* at 182–83. Noyes indicated that he had serious concerns about letting

---

20. The Court notes that Cheney's testimony on January 24th contradicts representations set forth in the minutes of the December 19, 2004 Board meeting in certain respects as to the Casinopartners' proposal and the provisions therein. *See* Vestin's Exhibit 11.

21. At the time of the hearings, it was stipulated that the Securities and Exchange Commission was in the process of conducting a

formal investigation of Vestin. *See* February 2nd Tr. at 118.

22. Noyes testified that he received payment from Scott of approximately $240,000 in connection with the sale of Noyes' shares of stock owned in the Debtors. *See* February 2nd Tr. at 183.

Scott get his "foot in the door," particularly in light of newspaper articles and reports he had reviewed concerning Scott's alleged "history of failures" in Idaho, Nevada, Louisiana, New York, Maine and Washington, D.C. *Id.* at 100. Noyes testified that he was familiar with an investigation by the FBI of Scott's activities although he did not know whether it was still ongoing. *Id.* He also knew that Scott was being investigated by the Internal Revenue Service. *Id.* at 100–101. Noyes also expressed the belief that one can judge a person by the company he keeps and that some of Scott's associates had criminal records. *Id.* at 99–100.

At the meeting, the Board members weighed a number of issues and concluded that the "acceptance of the Gural proposal would stand." *See* Vestin's Exhibit 9. Cheney acknowledged that the Idaho Offer appeared better on paper but he had did not trust Scott and had concerns about Scott carrying through on his promises. According to Cheney,

> we went over this proposal [Idaho Offer] from the first paragraph to the end many, many times and we kept coming back to the same solution that this is really not much better than the Gural Offer and we do not trust that Shawn Scott would follow through on any of this . . . . I mean, I've learned from experience. There's [sic] so many opportunities for him to escape out of these even if he's signed it. * * * The bottom line was that while there may be some elements of this [Idaho Offer] that were— it appeared on paper to be better than the Gural proposal. Looking at the overall proposal I must say that we say here we go again as we went through it. So yes, there are some elements that if you read them literally that look like they're better than the Gural proposal. But the whole matter of trust is still there . . . . The Board

just does not have the trust in [Shawn] Scott.

January 24th Tr. at 109–111. As Cheney explained, it's not a matter of money; it's a matter of trust. *See generally id.* at 128. Cheney acknowledged that the Board had not conducted a formal investigation concerning Gural's intentions for the Debtor, particularly given his ownership in Tioga Park raceway. *Id.* at 125. He did testify that the Board members had had discussions with individuals, including the manager of Tioga Park, which convinced them that any relationship between the two tracks would be beneficial to the owners and the horsemen should a circuit be created. *Id.* Gural himself testified at his deposition on October 25, 2004, that he had spoken with Spector at some point indicating his interest, at that time, in exploring the possibility of running the two tracks in such a way that would allow them to share operating expenses should Spector purchase Vernon Downs. *See* AVA's Exhibit 4 at 65. According to Cheney, the Board was more willing to rely on oral representations allegedly made by Gural concerning his planned involvement with the Debtors over the long run than anything that Scott might promise. *Id.* at 112. Noyes also expressed the same belief that Gural would continue to support the Debtors even if the VLT legislation failed to pass. *See* February 3rd Tr. at 28.

In this regard, AVA/Scott's counsel made inquiry of the Board concerning statements made by Gural at the October 2004 deposition, pointing out that in that deposition, Gural made it clear that he did not believe that Vernon Downs was worth $26 million. *See id.* at 73–74. In that regard, Gural also stated that he did not have a great deal of interest in purchasing the track as long as Vestin was owed $26 million. *Id.* at 64. However, at the same deposition, he stated that

[h]aving Vernon Downs closed is not good for me because I breed in New York. Vernon Downs is the best racetrack in New York State. So having Vernon Downs closed is bad for my financial interests as a horse breeder and a horse owner.

*Id.* at 50.

When questioned by AVA/Scott's counsel: "The Board was just not going to take it [the Idaho Offer] because Mr. Scott was associated with it, is that correct?", Cheney answered, "That's a fair assumption. Yes." *See* January 24th Tr. at 111. This view was reaffirmed by Noyes who indicated that the Board had given very little consideration to what the unsecured creditors would receive under the Idaho Offer because the Board simply did not want Scott and "his cronies" involved in the Debtor's operations. He also acknowledged that the Board and/or its counsel had not been in touch with the CC to obtain their input concerning the two proposals. Noyes attributed this, in part, to the short timeframe in which the Board had to respond to the Idaho Offer. Nor had the Board considered the video lottery gaming license requirements for anyone holding 10% ownership in the company. *See* February 3rd Tr. at 17.[23] Since AVA allegedly holds 52% of the common shares in the Debtors, even if Gural were to elect to obtain an 80% interest in the reorganized debtors under the terms of the Gural Offer, AVA would still hold more than 10% of the remaining stock (52% × 20) on a pro rata basis.

With respect to the Gural Offer, Cheney testified that it was "the only hope we have to get going for 2005." *See* January 24th Tr. at 37. He viewed the terms of the Gural Offer as fair "under the circumstances. Well, I believe I'd even go further and say that it is the only deal that makes any business sense to me." *Id.* at 38. He admitted that the Board had a big problem with the contingency involving passage of the VLT legislation. *Id.* at 38. Klein also expressed the opinion that the contingency would have been more troublesome but for the fact that he firmly believed the VLT legislation would be passed. *See* February 2nd Tr. at 26. Ultimately, he concluded that

the contingency not withstanding that going with Mr. Gural at this time would be the best move to get the track moving forward. It was nothing to do with any negative feelings toward Mr. Scott or a last minute offer, or anything like that. It's my firm belief, and I'd be hard-pressed to change my mind, not that I couldn't be convinced, what the most important thing now is to get Vernon Downs open, get people working, get creditors paid as a result of them being open. Get everything back on track, and to do that I felt that going with Mr. Gural's offer was the best way to get some activity started.

*Id.* at 43.

Cheney testified that it was the Board's understanding that all the Debtor s were asking for presently was approval of the DIP financing. *See* January 24th Tr. at 75.

---

23. At the hearing held on February 3, 2005, the Court agreed to take judicial notice § 2836–4.4 of the Codes, Rules and Regulations of the State of New York, applicable to Video Lottery Gaming. *See* February 3rd Tr. at 15. That particular section requires that each person who is a principal of a video lottery gaming agent be licensed. *Inter alia,* this requirement is applicable to each of the principal's officers and directors, as well as its managers, and "if a corporation, each of its shareholders who own or control more than 10 percent of the shares of the corporation if all warrants and/or options held by that shareholder were exercised; shareholders who are members of the same family will be considered as one shareholder for purposes of this section." 21 N.Y.C.R.R. § 2836–4.4(a).

Nevertheless, he acknowledged that the Gural Offer contemplated more than simply emergency financing to the Debtors. *Id.* at 75. The Gural Offer, according to Cheney, was viewed by the Board as providing a long term solution to the Debtors' chances for reorganization also. *Id.* at 77. Klein also testified that he considered the ways in which the Idaho Offer was better than the Gural Offer and acknowledging that the overriding issue of Scott's ability to be licensed by the R & W Board, he still believed that the Gural Offer was best for Vernon Downs. *See* February 2nd Tr. at 52.

*Financing Proposals Filed Subsequent to the Debtor's Motion*

On January 20, 2005, the same day that the Debtors filed the Motion seeking approval of the Gural Offer, Idaho Horizons indicated its willingness to advance the Debtors $412,000 in emergency funding ("Idaho DIP Offer").[24] *See* AVA's Exhibit 5. The Idaho DIP Offer required the application for the immediate appointment of Joe Lashinger ("Lashinger") as § 1104 trustee, as well as the entry of an Order of the Court approving Lashinger's appointment (FN as to UST's role). *Id.* The Idaho DIP Offer also included a provision whereby the Debtors were not obligated to proceed with the Gural Offer, giving Lashinger an opportunity to consider it, as well as other offers of DIP financing. *Id.* The offer was to expire upon the Court's approval or entry of an Order approving DIP financing by any other person or entity. *Id.*

Cheney testified on cross-examination that while the Board thought Lashinger would make an acceptable CEO, it was reluctant to enter any agreement with Scott. The consensus reached among the Board members was not to consider the Idaho DIP Offer. This was not done by means of a formal Board meeting. *See* January 24th Tr. at 85–86 and February 2nd Tr. at 158–59.

### DISCUSSION

Fed.R.Bankr.P. 4001(c)(2), applicable to motions seeking authority to obtain credit, states that

> [t]he court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

In this case, the Debtors' Motion was filed on January 20, 2004, with service provided for by facsimile and by overnight mail no later than 5:00 p.m. on January 20, 2005, on the United States Trustee, attorneys for the CC, and "all attorneys regularly appearing in this matter." Based on the Debtors' immediate need for financing and anticipated opposition thereto, the Court directed the Debtors to advise the parties that it would take testimony on the return date, if necessary. An evidentiary

---

24. By letter dated January 28, 2005, an offer was also made to the Debtors by Renaissance Companies, Inc. to provide financing in the form of a term loan up to $1 million, to be made available February 1, 2005, for the funding of operating expenses. The offer was contingent on, *inter alia*, the appointment of a chapter 11 trustee and the agreement by Vestin to subordinate its liens and claims. *See* Case Docket No. 267. Noyes testified that he and Cheney, as well as Klein, Kiley and Giambona, had discussed the offer over the speaker phone on February 2, 2005, describing it as a "gathering" of the Board members. This offer, as well as the Idaho DIP Offer, are not currently under consideration by the Court. The information is provided merely as background.

hearing was, in fact, begun on January 24, 2005. As indicated herein, emergency interim financing was orally approved by this Court on January 24th and again on February 3rd and was memorialized in two separate Orders, dated February 10, 2005.

The evidentiary hearing was continued on February 2, 2005, and ultimately was completed on February 3, 2005, after additional testimony and closing arguments. Testimony and documentary evidence were offered by the Debtors, as well as by AVA and Vestin that went well beyond the scope of the Debtors' immediate financing needs, as is obvious from the Court's Findings of Fact set out herein. In addition, the parties were then afforded an additional five days in which to submit memoranda of law.

The Court is fully cognizant of its obligations to comply with the notice requirements of Fed.R.Bankr.P. 4001(c)(2) and the limitations applicable to those requirements found in Fed.R.Bankr.P. 9006(c)(2). Both rules are intended to provide important rights of due process, including the right of all interested parties to notice and a full and fair opportunity to be heard. In this case, the hearing required pursuant to Fed.R.Bankr.P. 4001(c)(2) was conducted over a period of three days in which there was a full opportunity for all interested parties to present testimony, as well as documentary evidence.

The Court acknowledges that even if the evidentiary hearing held on February 3rd is deemed a final hearing, it was actually held on the 14th day following the date on which the Court's Order to Show was executed, a date that may not be included in the computation of the 15 day notice requirement of Fed.R.Bankr.P. 4001(c)(2). Notwithstanding the foregoing, the Court believes that the procedural due process requirements of Fed.R.Bankr.P. 4001(c)(2) have been met, and it would serve no beneficial purpose to require the Debtor to file a further 15 day notice of final hearing at which the issues, which already have been fully and fairly litigated, would be revisited. *See, generally, In re Manchester Center,* 123 B.R. 378, 381 (Bankr.C.D.Cal. 1991) (noting the need to establish a denial of the right to due process when considering noncompliance with the statutory notice requirements). In addition, such further delay would almost certainly have a negative impact on the Debtors. Accordingly, the Court will deem the evidentiary hearing, which concluded on February 3, 2005, a final hearing for purposes of Fed. R.Bankr.P. 4001(c)(2).

■ Having so concluded, the Court will address the substantive arguments of the parties. In this regard, Vestin and AVA contend that the Debtor's Board of Directors failed to comply with its own by-laws and applicable New York law, thereby rendering its approval of the Gural Offer a nullity.[25] Their first argument concerns Alderfer's election to the Board on December 15, 2004, on the recommendation of Woodard. *See* Vestin's Exhibit 11. In the minutes of that meeting, it is expressly stated that Alderfer must obtain clearance from the R & W Board. *Id.* In

---

**25.** In its initial opposition to the Motion, Vestin asserted that the Gural Offer "was not considered or approved by a properly constituted board of directors of the Debtors." *See* Vestin's Objection, filed January 24, 2005, at ¶ 9. Based on Vestin's recently filed Joint Memorandum of Law, the Court understands that its objection is not based on the current number of Board members, i.e. five versus nine as set forth in the Debtor's By-laws, but rather on the fact that Alderfer, who had been elected to the Board on December 15, 2005, had not been give notice of any of the subsequent Board meetings, including the one conducted on January 14, 2005, at which the Gural Offer was accepted and his election to the Board was rescinded.

the letter from Noyes, dated December 17, 2004, he states, "I believe you have to get clearance with the New York State Racing and Wagering Board before you can act." *See* Vestin's Exhibit 6. It was stipulated by the parties that Alderfer had actually completed an application in November 2004 and that Woodard had forwarded it to the R & W Board on November 10, 2004, a month prior to the Board meeting at which he was elected. Noyes testified that he had called the R & W Board prior to the meeting on January 14, 2005, at which Alderfer's appointment to the Debtor's Board was "rescinded," about the status of Alderfer's application and was told that nothing had been done. *See* February 2nd Tr. at 141–42.

It is Vestin and AVA's position that the failure to notify Alderfer of the meeting on January 14, 2005, renders the Board's decision to accept the Gural Offer invalid, relying on *Rapoport v. Schneider*, 29 N.Y.2d 396, 401, 328 N.Y.S.2d 431, 278 N.E.2d 642 (N.Y.1972). However, under the facts of this case, the Court must disagree with Vestin and AVA's position that the acceptance by the Board of the Gural Offer should be found invalid. Whether or not the Board's actions in "rescinding" Alderfer's election to it were improper, there is no dispute that at the time of the January 14, 2005 meeting, Alderfer did not have a license from the R & W Board and under the corporation's by-laws, even if Alderfer had received notice of the meeting, he was precluded from participating in it.

■ The next argument made by Vestin and AVA in opposing the Debtors' Motion is that the Board of Directors failed to exercise their best business judgment in accepting the Gural Offer. In this regard, under New York law, there is a "presumption of propriety [that] inures to the benefit of directors." *Hanson Trust PLC v.*

*ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir.1986). As noted by the New York Court of Appeals,

[i]t appears to us that the business judgment doctrine, at least in part, is grounded in the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments. The authority and responsibilities vested in corporate directors both by statute and decisional law proceed on the assumption that inescapably there can be no available objective standard by which the correctness of every corporate decision may be measured, by the courts or otherwise. Even if that were not the case, by definition the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility. Thus, absent evidence of bad faith or fraud [ ] the courts must and properly should respect their determinations.

*Auerbach v. Bennett*, 47 N.Y.2d 619, 630–31, 419 N.Y.S.2d 920, 393 N.E.2d 994 (N.Y. 1979); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr.W.D.Mo. 2003) (stating that under the "business judgment" rule,

the management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code.).

■ Corporate officers and directors have an obligation to perform their duties

"in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." N.Y. Bus. Corp. L. § 715(h) (duties of officers) and § 717(a) (duties of directors).[26] (McKinney 2003). In the bankruptcy context, the directors owe duties not only to the corporation and its shareholders, they also owe a duty of good faith to the creditors. *See New York Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y. 1, 110 N.E.2d 397 (N.Y. 1953); *see also Clarkson Co., Ltd. v. Shaheen*, 660 F.2d 506, 512 (2d Cir.1981)(discussing fiduciary duties of directors under New York law). Thus, the Debtor's Board of Directors had " 'an obligation to the community of interest that sustained the corporation, to exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity.' " *In re Global Service Group, LLC*, 316 B.R. 451, 460 (Bankr.S.D.N.Y. 2004), quoting *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, Civ. A. No. 12150, 1991 WL 277613, at *34 (Del.Ch.Dec.30, 1991)(discussing Delaware law).

▉▉ To overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent. *See Global Service Group*, 316 B.R.

at 461. In this regard, the Court must examine whether there has been evidence presented that establishes that the Board of Directors in considering the Gural Offer investigated the matter in a manner that was "so restricted in scope, so shallow in execution or otherwise so pro forma or halfhearted as to constitute a pretext or sham." *Auerbach*, 47 N.Y.2d at 634, 419 N.Y.S.2d 920, 393 N.E.2d 994; *see also Hanson*, 781 F.2d at 274 (indicating that "the duty of due care requires that a director's decision be made on the basis of 'reasonable diligence' in gathering and considering material information"). It is with this framework in mind and in the context of chapter 11 that the Court considers the Debtors' Motion seeking approval of the Gural Offer pursuant to Code § 364(c).

▉ In considering approval of the Gural Offer, the Court must first examine the efforts of the Debtors to obtain financing on an unsecured basis.[27] While a debtor is not required to show that it sought credit from every possible source, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Code § 364(a) and (b). *See In re Ames Department Stores, Inc.*, 115 B.R. 34, 37 (Bankr.S.D.N.Y.1990).

In this case, Cheny testified that it was his understanding that Eric Spector, who

---

**26.** Pursuant to N.Y. Gen. Bus. L. § 717(b), in taking any action, the directors are to consider both the long-term and short-term interests of the corporation and the "prospects for potential growth and development" of the corporation. N.Y. Gen. Bus. L. § 717(b)(I). They are also to consider the corporation's current employees, as well as its creditors, and "the ability of the corporation to provide, as a going concern, goods, services, employment opportunities and employment benefits and otherwise to contribute to the communities in which it does business." N.Y. Gen. Bus. L. § 717(b)(v).

**27.** While AVA/Vestin argues that the Debtors have not demonstrated that they made reasonable efforts to obtain unsecured credit, the Court would note that Vestin consented to representations made in the Sixth Interim Order Authorizing Limited Use of Cash Collateral by Consent, signed by the Court on December 23, 2004, which includes the representation that "The Debtor Borrowers are unable, pursuant to Section 364(a) or Section 364(b) of the Bankruptcy Code, to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense." *See* Case Docket No. 214 at ¶ D.

had served as CEO for the Debtors prior to leaving in October 2004 when Cheney assumed that role, had had negotiations with various financing entities. *See* January 24th Tr. at 22. Specifically, Spector had spoken with a representative at CoreStates Financial Corporation and with a representative at Wells Fargo. *Id.* Cheney expressed the view that the Debtors were unable to obtain financing given the amount of debt it already had, namely the $26 million allegedly owed to Vestin. *Id.* at 23. Klein also testified that the understood that Spector had had discussions with financing entities while he was CEO. *See* February 2nd Tr. at 39. Noyes also testified that he had made an inquiry concerning possible funding but had received a negative response. *Id.* at 134.

According to the minutes of the meeting of the Board of Directors held on December 15, 2004, various entities had expressed an interest in the Debtors, including an interest in purchasing the Debtors' assets pursuant to Code § 363. *See* Vestin's Exhibit 11. One such entity, Oneida Capital, LLC, in which Spector allegedly had some involvement, had proposed to provide DIP financing, along with a plan for reorganization of the Debtors and the appointment of a § 1104 trustee. *Id.*

The Court concludes that these efforts, which apparently involved some negotiations and discussions by the Debtor's officers and directors, as well as by Debtors' counsel, represent a reasonable effort on the Debtors' part, given the surrounding circumstances, sufficient to allow the Court to consider its Motion pursuant to Code § 364(c). The fact that some of the discussions may not have been initiated by the officers/directors of the Debtor does not alter this conclusion.

 What is before the Court is a motion seeking interim DIP financing pursuant to Code § 364(c), subject to a final hearing on a date yet to be scheduled. It is clear from a review of the Gural Offer, however, that it addresses more than simply providing the Debtor with postpetition DIP financing. Courts recognize that in connection with postpetition financing, lenders often exact favorable terms that may or may not have the effect of causing harm to the estate and creditors. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992), citing *Ames Department Stores*, 115 B.R. at 38; *In re Tenney Village Co., Inc.*, 104 B.R. 562, 567–570 (Bankr.D.N.H.1989). As the court in *Defender Drug Stores* pointed out,

> [w]hile certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender. Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest. The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.

*Defender Drug Stores*, 145 B.R. at 317; *see also Ames Department Stores*, 115 B.R. at 40 (noting that "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit

the estate as it is to benefit a party-in-interest").

The court in *Farmland,* after reviewing the factors considered by other courts in connection with DIP financing, "synthesized" them into the following five:

1) That the proposed financing is an exercise of sound and reasonable business judgment;

2) That the financing is in the best interests of the estate and its creditors;

3) That the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses;

4) That the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and

5) That the financing agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the Agents and the Lenders, on the other hand.

*Farmland,* 294 B.R. at 881.

In connection with the above factors, the Court notes that Vestin and AVA contend that the Board of Directors, in accepting the Gural Offer, "undertook no coherent or consistent due diligence with respect to the offer or the offeror." *See* Vestin and AVA's Joint Memorandum of Law at 7. They assert that the Board members made it clear that they were not going to accept any offer from either Scott or Vestin because of their bias, which, Vestin and AVA contend was "based entirely on rumor, hearsay and innuendo." *Id.* at 12.

The Court notes initially that at the time that the Board made its decision to accept the Gural Offer on January 14, 2005, it had before it only that proposal and one submitted on behalf of Casinopartners. Noyes testified that it had been a "tough call" in deciding on which proposal to accept. *See* February 2nd Tr. at 167. At the time that the Board considered the two offers on January 14, 2005, the Debtors were in dire financial straits and had serious concerns whether they would be able to make payroll in another week. According to the minutes of the Board meeting held on December 14, 2004, the proposal by Casinopartners provided for $500,000 in DIP financing and involved the sale of the Debtors' assets; whereas, the Gural Offer proposed $1.2 million in DIP financing upon approval by the Court. In comparing the two, the Board members felt that the Gural Offer presented the best chance for getting the track licensed and operational for the 2005 racing season. The Board members also believed that Gural, a long time New York breeder of horses, an owner of Tioga Park raceway and a man active in the VLT legislation in Albany, New York, was committed to racing at Vernon Downs and would have little difficulty obtaining a license from the R & W Board. They compared that to the fact that Casinopartners was a recently formed entity with no ties to New York. Its principal was from England and had been involved with casinos, not horseracing. Its other partners were believed to be Canadian. Based on their prior dealings with the R & W Board, they felt that there might be difficulties in Casinopartners obtaining licenses from the R & W Board in time for the 2005 racing season. These were the factors that the Board of Directors considered when they voted to accept the Gural proposal on January 14, 2005.

In an effort to comply with their fiduciary duty, they also considered the Idaho Proposal of January 17, 2005, despite having already accepted the Gural Offer. There was testimony to the effect that this was done on the advice of counsel, given the fact that the Idaho Proposal was being

made by the Debtors' largest shareholder and largest creditor. It is clear from the testimony of the three Board members that there was, indeed, a strong bias against accepting any proposal made by Scott and to a lesser degree, one made by Vestin. As Cheney testified, it was a matter of trust, rather than money that influenced the decision of the Board members not to renege on the Gural Offer by accepting the Idaho Offer. That is not to say that the Board rejected the Idaho Offer out of hand. It appears, however, that if it were to accept the Idaho Offer, it would be necessary that the Board members be convinced that their mistrust in Scott lacked any basis. It was not sufficient to know that Scott/Vestin had already made a substantial financial investment in the Debtors that they would want to protect. In fact, Klein testified that the fact that Scott had made a significant investment only caused him to question why Scott had delayed in correcting the situation with respect to his license. *See* February 2nd Tr. at 68. The Board members were all familiar with the fact that Scott had been denied a license by the R & W Board on the basis that he had made false statements in connection with his license application and that Scott's "experience, character and general fitness . . . would be inconsistent with the . . . best interests of racing generally." *See* AVA's Exhibit 6. In order to overcome what could be viewed as a presumption of mistrust, Noyes testified that he had investigated other projects with which Scott had had some involvement in Nevada, Maine, and Louisiana. Noyes had also had been personally questioned about Scott as part of an FBI investigation, although he acknowledged that he was uncertain whether it was still ongoing. None of these convinced the Board members to change their opinion of Scott. Noyes testified that he had not researched Gural's background, except to look at his

website. *See* February 2nd Tr. at 165. Klein acknowledged that he was not familiar with Gural's real estate dealings and how many companies/partners he might have been connected with. *See id.* at 64–65. While the Board members believed that Gural intended to make a personal investment in the Debtor, they admitted that there might be others involved about whom they had no information. In fact, Noyes testified that he understood that there was at least one other individual involved in the Gural Offer and acknowledged that he had not done any investigation concerning whether or not he was likely to be able to get a license from the R & W Board. *Id.* at 163–64.

The fact remains that they did consider both the Gural Offer and the Idaho Offer. The two were viewed as substantially similar. Admittedly, the Idaho Offer proposed to provide $500,000 more funding than the Gural Offer. However, Weiss pointed out in his testimony that the difference may not have been as significant as at first glance, given the exit fee to be paid to Vestin of either $250,000 or $500,000, depending on when its claim was paid. For the Board members, the difference was not sufficient to cause them to reject the Gural Offer, which they believed would provide them with immediate operating cash and allow the Debtor to proceed with the 2005 racing season. The Board members acknowledged their discomfort with the VLT legislation contingency of the Gural Offer, which was not contained in the Idaho Offer. Without exception, they testified that the legislation was critical to the operations of all small horse racing facilities in the state and could well impact on the Debtor's future viability as more than simply a harness track.

█ The Court concludes that as far as the Working Capital Loan component of the Gural Offer is concerned, the Debtors

have satisfied their burden pursuant to Code § 364(c). The Court finds that the Board of Directors exercised sound and reasonable business judgment, considering that which was material in connection with the Working Capital Loan and that the Gural Offer, limited to the Working Capital Loan, is in the best interests of the estates. The Court further concludes that the funding of $1.2 million is necessary and essential for the operation of the Debtors and that the terms are fair and reasonable under the circumstances and were negotiated in good faith. Accordingly, the Court will grant the Debtors' Motion to the extent that it seeks approval of the Working Capital Loan. The Court recognizes that its approval gives Gural the right to select a CEO approved by the Debtor and also subject to approval of the Court and licensure by the R & W Board, and to appoint two directors to the Debtor's Board. The Court views this as a reasonable quid pro quo, giving Gural some measure of control over his investment by getting involved in the management of the Debtors. *See In re Western Pacific Airlines, Inc.*, 223 B.R. 567, 574 (Bankr.D.Colo.1997).

Having so concluded, the Court feels compelled to deny the Debtors' Motion with respect to the other three financing components of the Gural Offer, namely the Capital Improvement Loan, Confirmation Investment and Post-confirmation Loan. When and if legislation is passed concerning the VLTs, the Debtors would certainly be welcome to revisit Gural's Offer of a capital improvement loan with the Court, but at this point in time, based on the testimony of DeRosa, the Court believes that the contingency is likely to simply delay the confirmation process. Furthermore, this Court agrees with the courts that have refused to allow a debtor to circumvent the confirmation process, which is central to the Code and the provisions set forth in chapter 11. The Debtors argue that by approving the provisions in the Gural Offer concerning the plan as set forth therein, the creditors are not being denied the opportunity to reject it in favor of another. Nevertheless, the Court feels strongly that it is important that all interested parties be permitted to consider a disclosure statement and a plan as part of a formal confirmation process, albeit a process that must move forward without further delay, whether proposed by the Debtors or, if appropriate, by others. The Court's conclusion in no way is intended to prevent the Debtors from proposing the same plan as that contained in the Gural Offer. However, its approval of this limited financing arrangement pursuant to Code § 364(c) hopefully will allow the Debtors an opportunity to formulate a plan with input from the CC and other interested parties. Accordingly, the Court holds that from its perspective, other than approving the Working Capital Loan, the balance of the Gural Offer is deemed beyond the scope of Code § 364 and, therefore, void. Under the terms of the Gural Offer, this allows Gural the option to elect to leave the provision concerning the Working Capital Loan enforceable and binding. Debtors' Exhibit B at page 2.

Based on the foregoing, it is hereby

ORDERED that the Debtors' motion seeking postpetition financing pursuant to Code § 364(c) is granted to the limited extent set forth herein.[28]

28. As noted above, the Court has already authorized emergency interim funding from

both Gural and Idaho Horizons pursuant to its Orders of February 10, 2005.