**In re MID–STATE RACEWAY, INC., Debtor.**

**In re Mid–State Development Corporation, Debtor.**

**Nos. 04–65746, 04–65745.**

United States Bankruptcy Court, N.D. New York.

March 9, 2005.

both Gural and Idaho Horizons pursuant to its Orders of February 10, 2005.

Harris Beach LLP (Lee E. Woodard, Esq., of counsel), Syracuse, NY, for Debtor.

Menter, Rudin & Trivelpiece, P.C. (Jeffrey A. Dove, Esq., of counsel), Syracuse, NY, for Vestin Mortgage, Inc.

Lackey Hershman LLP (Deborah Deitsch–Perez, Esq., of counsel), Dallas, TX, for All Vernon Acquisition, LLC.

The Towne Law Offices, P.C. (Michael Rhodes–Devey, Esq., of counsel), Albany, NY, for Jeffrey Gural.

Pryor Cashman Sherman & Flynn LLP (Tina Niehold Moss, Esq., of counsel), New York City, for Raceway Ventures, LLC.

Green & Seifter, PLLC (Michael J. Balanoff, Esq., of counsel), Syracuse, NY, for Harness Horse Association of Central New York.

Bond, Schoeneck & King, LLP (Camille Hill, Esq., of counsel), Syracuse, NY, for Official Committee of Unsecured Creditors.

Bond, Schoeneck & King, PLLC (Joseph Zagraniczny, Esq., of counsel), Syracuse, NY, for VIP Structures, Inc.

Costello, Cooney & Fearon, PLLC (Anthony R. Hanley, Esq., of counsel), Syracuse, NY, for County of Oneida.

E. Lisa Tang, Esq., Delmar, NY, for Dominick Giambona.

Guy A. Van Baalen, Esq., Utica, NY, Assistant U.S. Trustee.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Under consideration by the Court is an application ("Application") filed on January 31, 2005, by way of an Order to Show Cause, by Mid–State Raceway, Inc. and Mid–State Development Corporation (collectively the "Debtors") seeking an extension of the Debtors' exclusivity periods to file a plan of reorganization from February 1, 2005 to April 4, 2005 and to solicit acceptances for such plan for sixty days thereafter pursuant to § 1121(d) of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101–1330 ("Code"). Opposition to the Debtors' Application was filed jointly on behalf of Vestin Mortgage, Inc. ("Vestin") and All Vernon Acquisition, LLC ("AVA") on February 16, 2005. There were also objections filed on behalf of the Harness Horse Association of Central New York, Inc. ("Horse Association"), VIP Structures, Inc. ("VIP") and the Official Committee of Unsecured Creditors (the "Committee") on February 16, 2005. Dominick Giambona ("Giambona"), a shareholder, creditor and director of the Debtors, filed a response in support of the Debtors' Application on February 16, 2005.[1]

---

1. Giambona's counsel requested that the Court consider her argument that the Court grant the Debtors an extension of time to work things out with the Horse Association and Vestin and to file an amended plan. It was her position that the plan, which the

The Court heard oral argument on the Debtors' Application at its regular motion term in Utica, New York, on February 22, 2005. The Court afforded interested parties an opportunity to submit memoranda of law by March 1, 2005. The matter was submitted for written decision on that date.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A).

### FACTS

*Interested Parties*

The Debtors filed voluntary petitions pursuant to chapter 11 of the Code on August 11, 2004.[2] On August 12, 2004, the Court signed an Order granting joint administration of the two cases. Mid–State Raceway owns all of the stock of Mid–State Development. Mid–State Raceway operated the Vernon Downs racetrack in Vernon, New York,[3] and Mid–State Development operates an adjacent hotel, food and proposed video gaming business. Mid–State Raceway owns the real property on which the hotel is operated.

Vestin is the primary secured creditor of both Debtors. Vestin has asserted that it holds an allowed claim of over $26 million secured by a first lien on all of the Debtors' real and personal property. Since the filing of the cases, the Debtors and Vestin have entered into a series of stipulations for the use of cash collateral, which have provided for rollover security interests to Vestin. The Vestin loan is guaranteed, at least in part, by Shawn Scott ("Scott").

AVA, an entity owned by Scott, is the alleged owner of 52% of the issued and outstanding shares of Mid–State Raceway as a result of its purchase of the shares at a foreclosure sale sometime after September 2004 when Raceway Ventures, LLC, which at some point had purchased the shares from various Scott entities, allegedly defaulted on its obligations to those Scott entities.

The Horse Association, as the duly authorized association of owners, racers and drivers of harness horses at Vernon Downs, asserts a claim against Mid–State Raceway of approximately $475,000 for unpaid purses pursuant to the terms of an agreement entered into with Mid–State Raceway on December 1, 2003.

VIP asserts that it holds a secured claim against Mid–State Raceway in the amount of $807,998.93 in connection with design and construction work it performed at Vernon Downs.

The Official Committee of Unsecured Creditors ("CC") was appointed by the United States Trustee on October 28, 2004.

Debtors filed on February 21, 2005, had been put together quickly in reaction to the Court's decision of February 11, 2005, in which it approved postpetition financing pursuant to Code § 364. *See Mid–State Raceway, Inc.,* 323 B.R. 40, 2005 WL 894731 (Bankr. N.D.N.Y.2005) ("February 11th Decision"). The Court indicated that it would not consider the request unless the Debtors were to disavow the plan they had filed on February 21, 2005. Debtors' counsel indicated on the record that he would not agree to do that.

**2.** An involuntary chapter 11 petition had been filed against Mid–State Raceway, Inc. in the U.S. Bankruptcy Court for the District of Nevada on August 9, 2004 (Case No. 04–52382). The filing in the Northern District of New York was in response to the involuntary petition. The involuntary case was dismissed by Order of the Nevada Bankruptcy Court on September 29, 2004, and the case was closed on November 2, 2004.

**3.** Allegedly, horseracing and simulcasting operations ceased on July 23, 2004, when Mid–State Raceway's licenses were suspended.

## Procedural Background

As noted above, the Debtors filed voluntary petitions pursuant to chapter 11 of the Code on August 11, 2004. On November 19, 2004, the Debtors filed a motion seeking to extend the exclusivity periods to file a plan and solicit acceptances pursuant to Code § 1121(d) from December 9, 2004 and February 8, 2005, respectively, to April 8, 2005, and June 7, 2005, respectively. The Debtors' November 19th motion was opposed by Vestin on the basis that the Debtors had failed to establish cause for the requested extensions. At the hearing, Debtors' counsel represented to the Court that he had received an asset purchase agreement which had to be finalized before he could file a motion on behalf of the Debtors pursuant to Code § 363. Despite Vestin's opposition and based on the representations made by the Debtors' counsel, the Court granted limited relief to the Debtors from the bench at a hearing on December 23, 2004 and signed an order on December 30, 2004, which provided for an extension of the exclusivity period in which to file a plan to February 1, 2005, and to solicit acceptances for such plan to April 4, 2005 "without prejudice to requesting further extensions." The Court opined that allowing other entities to file plans might "chill" the negotiations between the Debtors and the prospective purchaser referred to by Debtors' counsel. The Court indicated that under the circumstances it had to consider not only the creditors in the case, but also the possibility that such a sale would arguably result not only in the continued viability of the racetrack but also would result in major employment for members of the community. The Court stressed the fact, however, that any argument by the Debtors in the future, seeking a further extension, would "begin to fall on deaf ears" without a more convincing demonstration of "cause."

As noted previously, the Application now under consideration was filed with the Court on January 31, 2005, for hearing on February 22, 2005. The Order to Show Cause, signed by the Court on January 31, 2005, provided that the Debtors' exclusivity period to file a plan was "temporarily" extended through February 22, 2005, the date of the hearing on the Debtors' Application pursuant to Code § 1121(d). The Order to Show Cause includes a separate ordering paragraph that provides

> that pending said return date, the Debtors' exclusive period to file a Plan is hereby extended through Feb. 22nd, 2005, and the time for the Debtors to solicit acceptances for such Plan is hereby extended from sixty (60) days from said date . . . [4]

The Debtors' Application, dated January 31, 2005, requests that the Court grant them an extension of the exclusivity period to file a plan from the current deadline of February 1, 2005 to April 4, 2005, and an extension of the exclusivity period for soliciting acceptance of the plan until sixty days thereafter. On February 21, 2005, one day prior to the scheduled hearing on the Application, the Debtors filed their plan and disclosure statement. An Order and Notice for Hearing on Disclosure Statement was signed by the Court on

---

4. Despite the language in the first ordering paragraph of the Order to Show Cause indicating an extension of the time to solicit acceptances of the plan for a period of sixty days from February 22, 2005, the Court's intent was simply to avoid the lapse between February 1, 2005, when exclusivity to file a plan was scheduled to terminate, and February 22, 2005, when the Debtors' Application for an extension of both exclusivity periods was scheduled to be heard. Both deadlines set out in the January 31, 2005 Order were to remain in effect pending the outcome of the February 22nd hearing.

February 24, 2005, scheduling a hearing on the disclosure statement for April 26, 2005.

## DISCUSSION

■ Daniel DeFoe once wrote in an essay, entitled "Of Bankrupts," that the actors in a bankruptcy case include the following:

"(1) There is the Honest Debtor, who fails by visible Necessity, Losses, Sickness, Decay of Trade, or the like.

(2) The Knavish, Designing, or Idle, Extravagant Debtor, who fails because either he has run out his Estate in Excesses, or on purpose to cheat and abuse his Creditors.

(3) There is the moderate Creditor, who seeks but his own, but will omit no lawful Means to gain it, and yet will hear reasonable and just Arguments and Proposals.

(4) There is the Rigorous Severe Creditor, that values not whether the Debtor be Honest Man or Knave, Able, or Unable, but will have his Debt, whether it be to be bad or no[t], without Mercy, without Compassion, full of Ill Language, Passion, and Revenge."

Robert Weisberg, *Commercial Morality, the Merchant Character, and the History of the Voidable Preference,* 39 Stan. L.Rev. 3, 8–9 (1986), quoting D. Defoe, *An Essay upon Projects,* pp. 206–207 (1697).

The Bankruptcy Court is assigned the task of resolving and balancing the interests of these "commercial actors" with the Code as its guide. To this end, Congress passed the Bankruptcy Reform Act of 1978, which included Code § 1121, which was subsequently amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, in an effort to balance the needs of the debtor and the interests of creditors. *See In re Public Serv. Co. of New Hampshire,* 88 B.R. 521, 533 (Bankr. D.N.H.1988) (noting that "[t]he effect of § 1121 is to give the debtor the exclusive right during a limited period to present the creditor body with a proposed plan of reorganization. Once the exclusivity period ends, competing plans may be proposed.").

Under Code § 1121, the debtor is provided 120 days after the date of the order for relief in a chapter 11 to file a plan. 11 U.S.C. § 1121(b). Any party in interest, including the debtor, may file a plan if and only if (1) a trustee has been appointed under chapter 11; (2) the debtor has not filed a plan within the 120 days referenced in subsection (b); or (3) the debtor has not filed a plan that has been accepted before 180 days after the date of the order for relief "by each class of claims or interests that is impaired under the plan." 11 U.S.C. § 1121(c). Pursuant to Code § 1121(d), "[o]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120–day period or the 180–day period referred to in this section." 11 U.S.C. § 1121(d).

According to the legislative history of the Bankruptcy Reform Act of 1978,

[p]roposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy. At the same time, the bill recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company.

H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 231–32, reprinted in 1978 U.S.Code Cong. & Admin. News ("U.S.C.C.A.N.")1978, 5963, 6191. As was later to be pointed out

in connection with Code § 1121, "[e]xclusivity is intended to promote an environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated. However, undue extension can result in excessively prolonged and costly delay, to the detriment of the creditors." H.R.Rep. No. 103–835, at 36 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3344.

 In considering the Debtors' Application, the Court is mindful that whether or not to grant an extension of exclusivity pursuant to Code § 1121(d) is a matter of discretion based on all facts and circumstances. *See In re Tony Downs Foods Co.*, 34 B.R. 405, 407 (Bankr.D.Minn.1983). It is the Debtors that have the burden of establishing the requisite cause for any extension. *See In re Texaco, Inc.*, 76 B.R. 322, 326 (Bankr.S.D.N.Y.1987); *see also In re Southwest Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 450 (Bankr.W.D.Tex.1987) (noting the necessity of establishing "cause" given that an extension of the exclusivity periods "represents a compromise between the dual goals of giving the debtor time to reorganize and protecting the creditors' legitimate interests").

 "[C]ause may be measured by a more lenient standard in the determination to grant an enlargement of time in which to gain acceptances to a filed plan [where a plan has already been filed]." *In re Perkins*, 71 B.R. 294, 299 (W.D.Tenn.1987). The court in *Perkins* explained that

> if the debtor has filed a plan; [sic] potential for upsetting the bargaining balance is more remote. No longer in the dark, with respect to the debtor's intentions, the creditors have a basis for decision, and can either accept the plan or fight extensions to the exclusivity period, in order to file a competing plan.

Therefore, extensions of the exclusivity period for gaining acceptances do not have the potential for detrimental impact upon the creditors' bargaining position occurring where no plan has been filed.

*Id.* However, while the Court may apply a more lenient standard in evaluating whether to extend the exclusivity period for soliciting acceptances because the Debtors have filed a plan, they must still establish that "cause" exists which necessitates such an extension.

At the hearing on December 23, 2004, the Court agreed to extend the exclusivity periods to February 1, 2005 and April 4, 2005, in light of the argument made by Debtors' counsel that a Code § 363 motion was imminent and that the deal would "absolutely go forward" by February 1, 2005. It did not. In their present Application in support of the request for a further extension of the exclusivity periods dated January 31, 2005, the "cause" given by the Debtors at that time was based on their assertion that they had filed a motion seeking approval of postpetition funding pursuant to Code § 364 (the "Gural Offer"), which had been heard on January 24, 2005, and was scheduled for further testimony on February 2, 2005. According to the Debtors, "it is apparent that Debtors will be unable to set forth a Plan based upon Mr. Gural's funding commitment until such time as the Court makes a determination regarding the Debtors' decision to proceed with this commitment." Debtors' Application at ¶ 9. The Court made its determination on the § 364 motion and issued its decision on February 11, 2005, some eight days after the conclusion of the third day of testimony on February 3, 2005 and eleven days prior to the hearing on the Debtors' Application.[5]

---

**5.** In its February 11th decision, the Court approved the Debtors' motion for funding pursuant to Code § 364(c). While the Gural Offer also included a proposed plan, the

At the time of the hearing on February 22, 2005, the "cause" alluded to in the Application for the extension of both deadlines no longer existed given the Court's February 11th decision. Indeed, since the Debtors had filed their plan on February 21, 2005, a portion of the relief sought, namely the request for an extension of the exclusivity period to file a plan, was rendered moot. It has been held that "where a debtor asks for an extension of the 120–day period and an extension is granted without objection by any party in interest, then the extension automatically operates to extend the 180–day period as well." *In re Ravenna Indus., Inc.,* 20 B.R. 886, 891 (Bankr.N.D.Ohio 1982); *contra In re Barker Estates, Inc.,* 14 B.R. 683, 685 (Bankr.W.D.N.Y.1981) (stating that "extension of one time period should not extend the other automatically"). It appears to be the Debtors' position that its exclusivity period to solicit acceptance of the plan is automatically extended for sixty days from the date they filed their plan. However, in this case, there are strenuous objections from various parties in interest.

■ The issue confronting the Court is whether, under the circumstances, it should grant the Debtors a further extension insofar as being able to gain acceptance of their plan, beyond the April 4th date, as set in the Court's December 30, 2004 Order. The problem lies in the fact that the Court has not been provided with any cause to extend the period of exclusivity for soliciting acceptance of the Debtors' plan beyond April 4, 2005. This is not a particularly large and complex case and there is no protracted litigation pending on which plan preparation depends. As Congress noted, "[a]n extension [to the debtor's exclusivity period] should not be employed as a tactical device to put pressure on parties in interest to yield to a plan

they consider unsatisfactory." S.Rep. No. 95–989, at 118 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5904.

■ The Court does not believe that an extension occurred automatically upon the Debtors' having filed their plan, particularly in light of the opposition filed by the various entities. Debtors' counsel has stressed the importance that the 2005 racing season go forward. A new chief executive officer is in place, as provided for in the Gural Offer. The Debtors have obtained financing of $1.2 million for day to day operations pending confirmation. Both should permit the racing season to go forward and should result in value to the Debtors as going concerns pending confirmation. Some or all of those opposing the Debtors' motion, including the Committee, have suggested on several occasions that there are other interested parties willing to file competing plans. Under those circumstances, any further delay in the confirmation process resulting from extension of the Debtors' exclusivity period could well damage the prospects of realizing the intrinsic economic value of the racetrack.

Based on representations made at the hearing on February 22, 2005, including those of Giambona's counsel, it appears that the plan and disclosure statement, in their current form, may not be satisfactory to the creditor body. Considering that the hearing on the Debtors' disclosure statement is not scheduled to be held until April 26, 2005, and that any solicitation for acceptance of the plan will occur only after objections to the disclosure statement have been resolved, the current deadline of April 4, 2005, admittedly is illusory, as would an extension to April 22, 2005, sixty days from the date the Debtors filed their plan.

Court declined to approve its terms in the context of a § 364(c) motion.

Giambona's counsel refers the Court to *In re Geriatrics Nursing Home, Inc.,* 187 B.R. 128 (D.N.J.1995) in which the district court reversed the holding of the bankruptcy court, which had found that the "potential for alternative—more favorable plans" was "cause" to terminate the debtors' exclusivity period to solicit acceptances. *Id.* at 133. In that case, the debtors had filed chapter 11 petitions on November 15, 1994, and had filed their plan and disclosure statement on January 31, 1995, within the original exclusivity periods provided pursuant to Code § 1121(b) and (c). *Id.* at 130. The debtor had requested an extension of its exclusivity period for seeking acceptances of its plan and a creditor had cross-moved, requesting that the exclusivity period be terminated. *Id.* The bankruptcy court denied the debtors' motion for an extension and granted the creditor's cross-motion, thereby terminating the exclusivity period for acceptance. The district court concluded that the bankruptcy court had "erred as a matter of law in terminating the exclusivity period." *Id.* at 134. The district court made a further finding that the debtors' exclusivity period was deemed stayed during the pendency of the appeal and agreed that it was to run for a "period equal to that remaining to the Debtors as of April 4, 1995 [the date of the hearing at which the bankruptcy court had terminated the exclusivity period] had it not been terminated." *Id.* However, it affirmed the bankruptcy court's denial of the debtors' motion to extend the exclusivity period finding that it "was a proper application of law to her factual conclusions." *Id.*

The district court's conclusion in *Geriatrics Nursing Home* is to be distinguished from the motion now before this Court. No one has requested that the Debtors' exclusivity period for acceptance, due to expire on April 4th, be terminated. Various entities simply oppose any further extension of the exclusivity period previously granted by this Court to solicit acceptance of the plan. Under the circumstances, including the prospect of alternative plans being submitted and the impending start of the 2005 racing season, the Court concludes that a further extension of the period for exclusive solicitation of acceptance is not warranted. As noted by the Honorable James E. Yacos,

> ending plan exclusivity does not by itself mean that multiple plans *will* be filed, or that the parties may not *still* agree to a consensual debtor plan. It simply returns the parties to a level playing field after the period of debtor control intended by Congress has expired.

*Public Serv. Co.,* 88 B.R. at 540 (emphasis in the original).

Based on the foregoing, it is hereby

ORDERED that the Debtors' Application seeking an extension of the exclusivity period to solicit acceptances of their plan beyond April 4, 2005, is denied.